KASOWITZ BENSON TORRES LLP
KIRSTEN C. JACKSON (State Bar No. 265952)
*kjackson@kasowitz.com*
2029 Century Park East, Suite 2000N
Los Angeles, CA 90067
Telephone:   (424) 288-7900
Facsimile:    (310) 943-3722

JENNIFER S. RECINE (*pro hac vice* application to be submitted)
*jrecine@kasowitz.com*
GARY W. DUNN (*pro hac vice* application to be submitted)
*gdunn@kasowitz.com*
MATTHEW J. WEISER (*pro hac vice* application to be submitted)
*mweiser@kasowitz.com*
TIFFANY L. HO (*pro hac vice* application to be submitted)
*tho@kasowitz.com*
1633 Broadway
New York, NY 10019
Tel:   (212) 506-1700
Fax: (212) 506-1800

Attorneys for Plaintiff
BEVERLY HILLS UNIFIED SCHOOL DISTRICT

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY HILLS UNIFIED SCHOOL DISTRICT,<br><br>          Plaintiff,<br><br>v.<br><br>FEDERAL TRANSIT ADMINISTRATION; K. JANE WILLIAMS, in her official capacity as Administrator of the Federal Transit Administration; LESLIE T. ROGERS, in his official capacity as Regional Administrator of the Federal Transit Administration's Region IX Office; LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, a public entity; PHILLIP A. WASHINGTON, in his official capacity as Chief Executive Officer of the Los Angeles Metropolitan Transportation Authority,<br><br>          Defendants. | Case No. 2:18-cv-0716<br><br>(to be related to No. CV 12-9861-GW (SSx), CV 13-1144-GW (SSx), CV 13-8609-GW (SSx), CV 13-8621-GW (SSx), CV 16-8390 (SSx))<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Beverly Hills Unified School District (the "School District" or "Plaintiff") alleges the following against Defendants Federal Transit Administration (the "FTA"), K. Jane Williams, in her official capacity as Administrator of the FTA, Leslie T. Rogers, in his official capacity as Regional Administrator, FTA Region IX, the Los Angeles County Metropolitan Transportation Authority ("Metro," and collectively with the FTA, the "Agencies"), and Phillip A. Washington, in his official capacity as Chief Executive Officer of Metro (collectively, "Defendants"):

## INTRODUCTION

1.      Defendants Metro and the FTA are the co-lead agencies on the Westside Purple Line Extension Project to extend the Metro Purple Line subway to a new western terminus located near the West Los Angeles Veterans Affairs Hospital (the "Project").  The Agencies plan to construct a subway tunnel beginning at a new station in Century City (the "Constellation Station") and running directly beneath the heart of the Beverly Hills High School (the "High School") campus.  To build the tunnel, the Agencies will undertake construction, boring, and excavation at construction staging areas located directly adjacent to the High School's fence line.

2.      Pursuant to a Court Order and under governing law, the Agencies were legally required to engage in a meaningful, reliable, and unbiased scientific analysis of the environmental impacts of the tunnel and construction staging areas. Given the presence of historically-significant structures and current and planned community recreational facilities on the High School's campus, the Agencies also were required to consider feasible and prudent alternatives to the planned alignment and to select the alternative that poses the least possible harm.  Yet, contrary to their legal obligations, the Agencies improperly committed to a course

of action engaging in the required environmental analysis. This commitment skewed that environmental testing and analysis and, unsurprisingly, resulted in a predetermined outcome. The outcome of the supplemental environmental analysis is not the one that is the most feasible and prudent or poses less overall harm to the High School's historic and recreational features. Instead, it's the precisely the same outcome the Agencies have intended to arrive at since as early as 2010.

3.    The question of whether the selected alignment or construction staging areas is the most feasible and prudent or poses the least overall harm is not a close question. The Agencies twisted themselves in knots to avoid factors that, if given proper weight, would have militated against their selected alignment and staging areas and invented pretextual bases to reject feasible and prudent alternatives that would present less overall harm to historic and recreational features.

4.    On November 22, 2017, the Agencies released their Final Supplemental Environmental Impact Statement ("FSEIS") and Supplemental Record of Decision ("ROD"). The FSEIS sets forth the Agencies' final determination to proceed with a tunnel alignment (the "Project Alignment") running at shallow depths beneath the heart of the High School's campus. It also states the Agencies' final decision to locate construction staging areas (the "Project Staging Areas") directly across from athletic fields on which the High School has placed temporary, portable classrooms.

5.    In arriving at these determinations, the FSEIS does not objectively, fairly, or adequately evaluate the harm to the High School, its students' health or learning environment, its historical buildings, its present and planned recreational buildings and facilities, or the harm to the broader community of Beverly Hills. The Project Alignment will be constructed and operated directly beneath existing and long-planned Section 4(f)-protected sites on the campus. The FSEIS fails to account for and adequately analyze the effect that the construction and operation of

COMPLAINT

the Project Alignment will have on those resources.  It wrongly concludes, based on an inadequate and biased review, that there are no feasible and prudent alternatives to the Project Staging Areas, and improperly rejects obviously feasible and certainly less harmful alternative alignments.  The Agencies likewise callously ignore, or fail to properly assess, the health risks and degradation of the learning environment posed by the construction and operation of the subway alignment through the center of the High School.

6.    The FSEIS's conclusion that the Project Alignment and Staging Areas pose no threat of harm to the High School's campus, its students, or community members who use its recreational facilities is fundamentally flawed.  The Project will cause substantial harm to health and safety of its students, undermine its learning environment, impede the renovation and modernization of its campus, and threaten the viability of its historic structures and recreational facilities.  Prudent and feasible alternatives to the Project Staging Areas and less harmful subway alignments exist that would avoid or mitigate each of these harms.  The Agencies' failure to adequately consider and adopt these reasonable alternatives was legally improper.  Without taking the mandated hard look at the environmental impacts of the Project Alignment and Staging Areas, the Agencies' selection of them was arbitrary, capricious, an abuse of discretion, and contrary to the applicable law.

7.    Of course, the weakness of the Agencies' evaluation stems from the fact that it was never open to any change in the location of the alignment or the staging areas.  During the entire period of the review the FTA disbursed federal funds to further its predetermined Project Alignment and Staging Areas, and Metro used those federal funds to, among other things, acquire property along the planned route and for the staging areas.  FTA and Metro continue to do so today, including through efforts to acquire the School District's property, the proprietary of which is the crux of this dispute.

COMPLAINT

8. Indeed, during the supplemental environmental impact analysis process, Metro openly acknowledged that it could not consider less harmful alternatives to the Project Alignment because Metro had already expended significant resources in favor of the Project Alignment, including purchasing millions of dollars' worth of property in furtherance of its predetermined outcome. Thus, the Agencies could not -- and would not -- consider viable alternatives that mitigate or avoid the harm posed to the High School by the Project. Thus, to reach their predetermined conclusion, the Agencies were compelled to deny or minimize the substantial threat of harm to the High School posed by the Project Alignment and staging areas and invent wholly unsupported reasons why alternatives could not be pursued. This after-the-fact justification fundamentally violates the very purpose of NEPA and Section 4(f).

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his duty), and 28 U.S.C. §§ 2201-2202 ("creation of remedy" and "further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy). Plaintiff has a right to bring this action pursuant to, *inter alia*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 and 23 U.S.C. § 139(k)-(l). FTA's issuance of the Supplemental Record of Decision approving the FSEIS constitutes final agency action. 82 Fed. Reg. 56,972 (Dec. 1, 2017).

10. Additionally, this Court has jurisdiction over Metro and Mr. Washington. This Court may issue an injunction under NEPA against a nonfederal party who received federal financial assistance in furtherance of the challenged activity. *Homeowners Emergency Life Protection Committee v. Lynn*, 541 F.2d 814 (9th Cir. 1976). Here, in furtherance of the challenged activity, Metro receives significant federal financial assistance. As the Project's sponsor and joint lead

COMPLAINT

agency, Metro was required to comply with NEPA in preparing the environmental impact statement.

11.    Venue is proper in the Central District of California under 28 U.S.C. § 1391 because members of Plaintiff live in the District; land affected by the action is located in the District; and a substantial part of the acts or omissions giving rise to this Complaint occurred in the District.

12.    Venue is proper in the Western Division of the Central District of California because the land that is the subject of this action is in Los Angeles County, and because a substantial part of the acts or omissions giving rise to this Complaint occurred in Los Angeles County.

## THE PARTIES

13.    Plaintiff is a unified school district in the City of Beverly Hills organized and operating under the public education laws of the State of California. The School District is responsible for administering and overseeing all public education within the City.  The School District is governed by a five-person Board of Education that is elected by the residents of the City.

14.    Defendant FTA is the federal agency charged with approving projects for funding under the New Starts program, which is the primary federal funding mechanism for locally planned, implemented, and operated transit projects, including the Westside Subway Extension Project.  The FTA is responsible for complying with NEPA in connection with any decisions involving major federal actions.  The FTA is responsible for complying with Section 4(f) and Section 106 in connection with actions affecting historic or recreational properties.  Together with Metro, who prepared the environmental impact statement ("EIS") on which the FTA relied (*see*, *e.g.*, 23 C.F.R. § 771.109(c)), the FTA issued the DEIS and the FEIS for the Project in September, 2010 and March 2012, respectively.   The FTA independently issued the ROD selecting the Constellation Boulevard Alternative on August 9, 2012.  After this Court ordered a supplemental environmental analysis,

the FTA, again together with Metro, issued the DSEIS and the FSEIS in May 2017 and November 2017, respectively. FTA independently issued the Supplemental ROD reaffirming its selection of the Constellation Boulevard Alternative on November 22, 2017.

15.    Defendant FTA is a federal government agency within the U.S. Department of Transportation and is authorized to plan and implement new transit infrastructure or improvements to existing infrastructure. Regional FTA Offices prepare and participate in environmental impact assessments of federally-funded projects and have review authority for the final action decision. The FTA is the lead agency for the Project with regard to NEPA and is charged with the duty of ensuring compliance with NEPA, Section 4(f), Section 106, and other applicable federal laws.

16.    Defendant K. Jane Williams is the Administrator of the FTA, and she is responsible for all FTA activities. Defendant Williams is sued in her official capacity.

17.    Defendant Leslie T. Rogers is the Regional Administrator of the FTA's Region IX Office and is the FTA official responsible for issuance of the ROD. Defendant Rogers is sued in his official capacity.

18.    Defendant Metro is a county transportation commission created by California statute as the single successor agency to the Southern California Rapid Transit District and the Los Angeles County Transportation Commission. Metro serves as the transportation agency for the City and County of Los Angeles, California, and it is responsible for the planning, coordination, design, building and operation of the public transportation system for Los Angeles County, including but not limited to its bus, subway, and light rail system. Metro is the joint lead agency for the Project pursuant 23 U.S.C. § 139(c)(3). Metro, working with FTA, prepared the environmental documentation, including the EIS and FSEIS, and developed the Project, as both an applicant for federal funding and joint lead agency pursuant to 23 U.S.C. § 139.

19.     Defendant Phillip A. Washington ("Washington") is the Chief Executive Officer of Metro and is responsible for all Metro's activities. Washington is sued in his official capacity.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The School District's Development Plan

20.     With a nearly century-old campus, Beverly Hills High School is the only public secondary educational facility located within the City of Beverly Hills. It serves both the educational needs of its students and the recreational and cultural needs of the broader community. Beverly Hills residents use the High School's facilities for recreation, sports, and community events. The campus's athletic and recreational facilities include gymnasiums, an indoor swimming pool, athletic fields, a track, and tennis courts that are used year-round by the community at large through a cooperative use agreement with the City of Beverly Hills.

21.     The High School's campus is undersized. The population of Beverly Hills has been steadily growing, and with that growth the number of community members and students using the High School's facilities has increased. The High School, as a result, lacks adequate facilities to comply with various federal state educational standards, and it struggles to meet the recreational needs of the community. Its older classrooms do not meet California state educational standards, and its gymnasiums, track, and swimming pool do not meet California Intramural Federation standards and are too small to fully serve the growing community's needs. Parking at the High School is also in short supply, a problem that is expected to worsen as the Beverly Hills community grows. This lack of parking impedes community use of the High School's recreational facilities. Events held at the High School frequently overwhelm on-campus and neighborhood parking.

22.     In August 2008, to address overcrowding on the Campus and meet the current and long-term public education needs of the City, the School District released a draft five-year master plan ("Master Plan") that called for upgrading and

COMPLAINT

1   modernizing many of the buildings on the Campus and included a detailed list of
2   potential projects.  The Master Plan recognized that restrictions imposed by the
3   California Field Act (California Education Code §§ 17280-17317, 80030-81149)
4   would require significant underground development in connection with many of the
5   proposed projects.  Parking and perhaps other facilities will need to be built
6   underground, because of height restrictions.  In November 2008, the City passed a
7   $334 million school bond ("School Bond") to fund implementation of the Master
8   Plan.

9        23.    The Master Plan is a short-term fix to address the long-term needs of
10  the Beverly Hills community over the next century.  The High School is the primary
11  public high school in the City, and acquisition of additional property is prohibitively
12  expensive.  Thus, the Campus will *remain* the primary public high school location
13  in the City.  Placing a subway tunnel under the Campus will limit the school's ability
14  to expand – both under the current Master Plan and also in future years to serve the
15  projected increased population of Beverly Hills.

16       **B.    The Westside Subway Extension Project**

17       24.    For decades, Metro has been planning the Westside Purple Line
18  Subway Extension (the "Project"), a public transportation project to extend the
19  Purple Line subway from the Wilshire/Western Station to the West Los Angeles
20  Veteran Affairs Hospital.  Metro's predecessor determined in 1968 that the extension
21  should travel through Century City along the public right-of-way on Santa Monica
22  Boulevard to avoid tunneling under Beverly Hills' only public high school.  In fall
23  of 2007, Metro initiated the environmental analysis for the Project by launching an
24  Alternatives Analysis of transportation options and alternatives.  Correspondence
25  between Metro and the School District reveals that Metro has been aware of the
26  School District's Master Plan, including the plans for underground development,
27  since at least 2008.

28

COMPLAINT

25.     In January 2009, Metro issued an Alternatives Analysis Study.  The FTA then authorized Metro, as a joint lead agency for the Project, to prepare a DEIS to consider and carry forward five subway alternatives, including Alignment 2, an 8.9 mile extension traveling southwest through Century City.  In Century City, Alignment 2 included two station options and corresponding alignments.  The "preferred" station location was Santa Monica and Avenue of the Stars ("Santa Monica"), with a route along Santa Monica which avoids the High School.  The alternative option was a station at Constellation and Avenue of the Stars ("Constellation"), with a route that tunnels directly underneath the High School campus.

26.     Throughout the multi-year planning process for the Project, the FTA and Metro publicly purported to be pursuing two alternatives for the Century City subway station.  In fact, until October 2011, the FTA's and Metro's public filings concerning the Project cited Santa Monica as the "base" or preferred alternative for that station.  But, during most of this time period, the FTA and Metro were actually only pursuing the Constellation Alignment.

27.     Specifically, in early 2010, Metro unilaterally and secretly changed its plans for the location of the Century City station.  In April 2010, Metro informed the FTA (but not the public) that it would pursue the alternative alignment to Constellation Boulevard that would tunnel directly beneath the high school.  Yet, in September 2010, Metro issued a Draft Environmental Impact Statement ("DEIS") which identified the Santa Monica location as the "base" or preferred location for the Century City station.  At the time, Metro's own ridership analysis showed higher ridership at Santa Monica Boulevard and its seismic study did not foreclose a Santa Monica Station.  Thereafter, Metro and the FTA continued to represent to the public that the preferred location for the Century City subway station was at Santa Monica Boulevard and Avenue of the Stars.  Metro and the FTA did not publicly disclose the decision to locate the station at Constellation in order to avoid the backlash they

COMPLAINT

believed would result from the disclosure.  In the meantime, with public comment held in check, the FTA and Metro engaged in additional ridership and seismic studies to rationalize their placement of the station at Constellation Boulevard.

28.    It was not until October 2011, one year after the close of the public comment period, that Metro publicly disclosed for the first time its decision to proceed with a station along Constellation Boulevard.  Yet, Metro's and the FTA's seismic studies purportedly supporting this conclusion were commissioned and undertaken after the decision was made, and were designed to support this conclusion, as opposed to objectively evaluate alternatives.  The seismic studies produced by this flawed process exaggerated evidence of faults at Santa Monica Boulevard, while overlooking the evidence and potential impact of specific faults at Constellation Boulevard, located only 1000 feet away.

29.    In response to Metro's belatedly issued seismic reports, the School District and the City of Beverly Hills both initiated independent seismic analyses using more precise methodologies, more advanced technologies, and more extensive examination than Metro's studies.  The resulting reports called into question the basic findings of Metro's seismic studies.

30.    Notwithstanding these environmental concerns, Metro and the FTA refused to prepare a supplemental EIS to address the new data and permit the public to comment on the new seismic information.  On March 9, 2012, Metro and FTA issued the Final Environmental Impact Statement ("FEIS"), which selected the Constellation Boulevard location and corresponding alignment for the Century City Station.  The FEIS did not address the new data generated by the School District's and others' independent seismic studies, and it paid little attention to other safety issues and other environmental impacts, such as methane migration and the public health-related impacts of construction.

31.    Likewise, the FEIS failed to consider that tunneling underneath the Campus to build the Project Alignment would severely limit the use of the Campus,

COMPLAINT

which is a protected historic and recreational resource for students and the public. Portions of the tunnel are planned for a depth so shallow that it will cause vibrations and noise disruptions in the school buildings above.  Yet, extraordinarily, the FEIS determined that tunneling underneath the Campus would not constitute a "use" of the property, and thus failed to consider prudent and feasible alternatives to such use.

32.    On August 9, 2012, the FTA issued its Record of Decision ("ROD"), prepared by Metro, which relied upon the analysis contained in the FEIS.  The ROD approved the station on Constellation Boulevard and the decision to tunnel beneath the High School in the exact configuration that Metro had proposed.

33.    On November 12, 2012, the School District filed a complaint for declaratory and injunctive relief based on the FTA and Metro's flawed environmental analysis.  In particular, the School District requested that the District Court (1) declare that Defendants violated NEPA, Section 4(f), and the APA by issuing the Record of Decision approving the FEIS, (2) issue an injunction requiring that Defendants fully comply with NEPA and Section 4(f) and their implementing regulations, and specifically to ensure that Defendants take no further actions toward proceeding with the Project until they have fully complied with these laws, (3) prohibit the FTA from obligating federal funds, (4) declare the FEIS invalid, and (5) order that the ROD be vacated, set aside, and/or rescinded.

**C.    The District Court Finds Serious Flaws in the Agencies' FEIS and Orders a Supplemental Environmental Analysis.**

34.    On February 1, 2016, the District Court issued a 217-page Tentative Ruling.  The Tentative Ruling found that the FTA had committed multiple serious violations of NEPA and Section 4(f), including that:

- The EIS failed to complete any analysis of the public health-related impacts of construction, depriving FTA decision makers of information that could impact the selection of construction sites, the mine shaft location, and mitigation measures;

12

- The EIS failed to disclose risks associated with methane migration and a possible explosion, even though such information could impact FTA's willingness to tunnel under unprotected buildings without mitigation measures;
- The EIS wrongly presented its conclusions about seismic safety as though they were "above reproach," even though revelations about seismic uncertainty could impact FTA's evaluation of alternative station locations;
- FTA erred in refusing to prepare a supplemental EIS after generating and receiving significant new seismic information, cutting off public comment and response and precluding decision making based on complete information;
- FTA acted arbitrarily and capriciously in determining that tunneling under the High School is not a "use" under Section 4(f), depriving FTA decision makers of the information required by Section 4(f)'s follow-on analysis of "prudent and feasible alternatives" and "all possible planning" to minimize any harm arising from such use.

35.     The Court also determined that it was a "***very close question***" whether the Agencies predetermined the location of the Century City station before engaging in their original environmental analysis and that the analysis underlying the decision to move the station from Santa Monica Boulevard to Constellation Boulevard "certainly appear[ed] to have been slanted in one direction," but did not meet the standard for predetermination *at that time*.

36.     On August 12, 2016, the Court adopted as final its February 1, 2016 Tentative Ruling and remanded the FTA's decision with instructions to prepare a supplemental environmental impact statement ("SEIS") as follows:

(1) Identify direct and constructive "use" of the High School campus from subway construction and operation on, beneath, or near the campus, and if construction or operation causes a "use," an evaluation of "prudent and

feasible alternatives" to such use and "all possible planning" to minimize harm under Section 4(f);

(2) Discuss the completeness of the available seismic risk information;

(3) Discuss post-DEIS seismic and ridership studies available to FTA;

(4) Analyze potential public health impact of NOx emissions during construction of the Constellation Station and tunneling and, depending on the results of that analysis, an assessment of the feasibility and efficacy of mitigation measures and alternatives to address such potential impacts;

(5) Analyze potential public health impacts of dust and diesel particulate matter emissions ($PM_{10}$ and $PM_{2.5}$) from Constellation Station construction and, depending on the results of that analysis, an assessment of the feasibility and efficacy of mitigation measures and alternatives to address such potential impacts; and

(6) Analyze potential risks of soil gas migration from tunneling or other construction activities related to Section 2 and, depending on the results of that analysis, disclosure of any information required by 40 C.F.R. §§ 1502.9, 1502.22, and *San Luis Obispo Mothers for Peace v. NRC*, 449 F.3d 1016 (9th Cir. 2006), and an assessment of the feasibility and efficacy of mitigation measures and alternatives to address such potential risks and disclosures.

37.    While the Court declined to apply the presumptive remedy of vacatur during remand, it warned that "if on remand the FTA does act impermissibly or inappropriately so as to raise a basis for the charge or pre-determination or bad faith, Plaintiffs are free to raise that contention again and the Court will consider it."

38.    On November 22, 2017, the Agencies issued the Final SEIS and the Supplemental ROD.  On December, 8, 2017, the Federal Defendants filed a Notice of Satisfaction of Remand reporting that they have "satisfied all of the requirements of the Court's remand order" by evaluating the topics outlined in the Court's

COMPLAINT

Remedy Order.  By stipulation dated December 22, 2017, the parties agreed that the Federal Defendants completed the procedural tasks outlined in the Remedy Order and that the action would be dismissed, while expressly preserving the right of the School District to challenge the Final SEIS and Supplemental ROD by filing complaints in a new action.

39.    The School District now challenges the Final SEIS and Supplemental ROD on the following grounds:

## I.    THE AGENCIES HAVE PREDETERMINED THE OUTCOME OF THE SUPPLEMENTAL ENVIRONMENTAL ANALYSIS

40.    While conducting the court-ordered supplemental environmental analysis, the Agencies made substantial, irrevocable commitments in favor of the Project Alignment and Staging Areas.  These commitments predetermined the outcome of the FSEIS and violated the Agencies' repeated assurances to the District Court and the Ninth Circuit that the $1.187 billion Section 2 FFGA and $1.3765 billion Design/Build Contracts would not improperly slant their analysis towards the Project Alignment or Staging Areas, notwithstanding the fact that money and energy would continue to be expended to advance both the Project Alignment and the acquisition of property for the Staging Areas while the Agencies were purportedly undertaking the Court-ordered remand analysis.

### A.    The Agencies' Assurances to the District Court and the Ninth Circuit

41.    In its February 1, 2016 Tentative Ruling, the Court expressed concern that the Agencies had already committed themselves to the Project Alignment, acknowledging that the question of whether the Agencies predetermined the location of the Century City station before engaging in their original environmental analysis was a "*very close question*" and that the analysis underlying the decision to move the station from Santa Monica Boulevard to Constellation Boulevard "certainly appear[ed] to have been slanted in one direction."  The Court concluded, however,

that at the time, "the case lack[ed] the necessary binding commitment" of resources required to find predetermination.

42. The Court's concern regarding the Agencies' commitments continued in subsequent remedy proceedings. But to avoid the presumptive remedy of vacatur, the FTA informed the Court that vacating the flawed Record of Decision would result in a significant delay to the Project, relying in large part on the Declaration of Defendant Philip Washington, the CEO of Metro. Mr. Washington stated that if the Court vacated the ROD, then the FTA would be unable to execute the FFGA for Section 2 until it issued an amended ROD after the Agencies completed a supplemental NEPA analysis, and in turn, Metro would not have the funding in place to award the Section 2 design/build contract.

43. At a subsequent deposition, Washington conceded that once the FFGA was in place, that agreement would affect how Metro would evaluate alternative alignments because a change in alignment would be a "change order of high magnitude" to the design/build contract and a "cardinal change in many respects" to the FFGA.

44. At a June 1, 2016 hearing, the Court cautioned that "should Metro follow down that path [of obtaining the FFGA and executing design/build contracts] in the absence of a vacatur, Plaintiffs' argument for predetermination get[s] much stronger if they return to the Court with that contention." On August 12, 2016, the Court adopted as final its February 1, 2016 Tentative Ruling and issued its final order on remedy (the "Remedy Order"), remanding the matter to the FTA to conduct a supplemental environmental analysis. While the Court declined to vacate the Record of Decision during remand, it warned that "if on remand the FTA does act impermissibly or inappropriately so as to raise a basis for the charge or predetermination or bad faith, Plaintiffs are free to raise that contention again and the Court will consider it."

COMPLAINT

45.     Notwithstanding the Court's warning, while the SEIS process was ongoing, the Agencies continued to commit themselves in favor of their predetermined alignment.  They sped up the timeline for entering into contractual commitments in furtherance of the Project Alignment while simultaneously slowing down the process for completing their remand analysis.  On October 26, 2016, six days after Metro's announcement that the required supplemental review would not be completed until the summer of 2017, the FTA notified Congress of its intent to sign an FFGA for Section 2.

46.     The School District filed a preliminary injunction motion to prevent the execution of the FFGA and Design/Build Contracts.  In subsequent proceedings, the FTA repeatedly represented to the Court that the FFGA and the Design/Build Contracts could be changed.  On January 12, 2017, relying on the Agencies' assurances, the Court issued an order denying Plaintiffs' motion for a preliminary injunction.  The Court, however, warned that:

> [The FTA] has plainly argued that . . . changes are possible in connection with both the FFGA and design/build contract.  ***Having represented to the Court that those agreements may be changed, the FTA (and/or Metro) will not be heard at a later date to claim that they may not, or that doing so would be too costly as a basis for asserting that the alignment cannot be changed.***  This is, in fact, reflective of the larger point the FTA needs to be clear about: the Court will not allow the FTA to rely on execution of the FFGA or design/build contract for Phase 2, or any inertia caused thereby, to support the suitability of any further NEPA analysis the Court has ordered the FTA to undertake.

COMPLAINT

47.    On appeal from the Court's denial of Plaintiffs' motion for preliminary injunction, the FTA informed the Ninth Circuit that the "FTA and Metro have repeatedly assured the district court that they have authority to amend the Agreement and have acknowledged that they must justify their decision on remand without reference to any costs of amending the Agreement."

48.    Metro made similar disingenuous representations to the Ninth Circuit. In an amicus brief, Metro represented that its "execution of the Section 2 design/build contract does not irreversibly and irrevocably commit the agencies to any particular Project alignment" because "[t]he contract itself, like the Grant Agreement, expressly contemplates that changes can be made after execution and provides a detailed procedure for doing just that."  Metro further assured the Ninth Circuit that "although Metro has committed funds to the Project by executing the design/build contract, those funds can be used to build the Project along any of the alternative alignments still under consideration."  And, most importantly, Metro assured the Ninth Circuit that "the district court expressly prohibited Metro or FTA from later arguing that it would be too costly to change the project alignment."

49.    Although it denied the School District's appeal as premature, and took the Agencies at their word, relying on the FTA's "representat[ion] to the district court that the Grant Agreement and the Design/Build Contract would not prevent it from making changes to the planned alignment,"  the Ninth Circuit invited this Court, when it reviews the FTA's supplemental EIS, to "evaluate whether the FTA's commitments—including those made via the Grant Agreement and Design/Build Contract—in fact infected the FTA's analysis of alternatives."

### B.    The Agencies' Irrevocable Contractual Commitments

50.    On December 16, 2016, while the School District's preliminary injunction motion was pending and months before the Agencies issued a DSEIS, the FTA and Metro executed the FFGA, obligating the FTA to commit $1.187 billion of taxpayer funds to the Project Alignment.  That same day, the FTA awarded Metro

the first FFGA disbursement of $100 million for the Project Alignment, specifically disbursing $34,481,540 to advanced utility relocation and demolition/site clearing work, $49,107,149 to the purchase of real estate and relocation of existing households and businesses, including for the purchase of approximately 37 land parcels along the Project Alignment right of way (inclusive of the School District's property) and relocation of 25 commercial tenants, and $16,411,291 to final design and engineering management services contracts, agency costs, and construction management support services contracts. Thus, instead of prohibiting Metro from making irretrievable resource commitments to the Project while the supplemental review process was ongoing as it was required to do under NEPA regulations, the FTA unlawfully disbursed federal funds with full knowledge that Metro would use the funds for final design work and property acquisitions for Section 2 of the Project.

51. That same day, the FTA awarded the first federal disbursement of $43 million under the Congestion Mitigation and Air Quality Improvement Program. The FTA specifically disbursed $18,058,275 for real estate acquisitions and $24,942,725 for professional services.

52. With federal funds in place, on January 26, 2017, Metro awarded the $1.3765 billion Section 2 design/build contract to Tutor Perini/O&G. On April 26, 2017, although the Agencies still had yet to issue the DSEIS and analyze feasible and prudent alternatives to the Project Alignment and Staging Areas, Metro issued to Tutor Perini/O&G a Notice to Proceed with construction of the Section 2 stations and tunnels. Reflecting its intent to reaffirm selection of the Project Alignment, Metro issued this Notice to Proceed notwithstanding its recognition that a stop work order to its design build contractor in the event that the supplemental environmental analysis requires a change in the Project Alignment would be an "owner caused delay" under the contract terms, which means that Metro would be financially responsible for all increases in the contract price including daily overhead and delay rates, material storage costs during the delay, construction equipment rental costs

during the delay, and materials and equipment already under order, as well as the escalated costs of construction when work could re-commence.

## C.   The Agencies' Further Irrevocable Commitments

53.    Having received the FTA's first disbursement of $100 million in federal funds, Metro began acquiring properties along the Project Alignment and for the Project Staging Areas.  Without informing the public, Metro had, by the beginning of July 2017, acquired all three properties required for Project Construction Staging Areas 2 and 3 (1940 Century Park East, 2040 Century Park East, and 1950 Century Park East), despite the fact that the Agencies had yet to complete the supplemental environmental analysis of feasible and prudent and least possible harm alternatives to the Project Alignment and Staging Areas.  The Agencies have refused to provide information on the costs of these properties.

54.    Additionally, the Agencies have already completed at least 10 relocations for the Project, including 3 relocations at 1950 Century Park East and 3 relocations (with more in process) at 1940 Century Park East, treating these Staging Areas as a foregone conclusion.  The Agencies have not provided information on the costs of these relocations.  Use of federal funds for Metro's acquisition of property is ongoing.

55.    On July 19, 2017, Metro began the appraisal process for 20 subsurface easements along the Project Alignment by certifying the easements. The full extent of Metro's acquisitions have yet to be revealed.  The FTA knew that Metro was improperly acquiring properties throughout the supplemental environmental review process because it participated on monthly calls with Metro during which it received updates on Metro's acquisition progress.  Nevertheless, the FTA failed to stop Metro from making resource commitments that would limit the range of reasonable alternatives.

56.    On September 17, 2017, again before the Agencies completed the supplemental analysis, the FTA awarded Metro its second FFGA disbursement of

COMPLAINT

$100 million, again with knowledge that Metro would use the federal funds for real estate acquisitions and final design work.    The FTA and Metro allocated $46,331,316 to advanced utility relocation and "design build contract general requirements," $31,469,502 for real estate acquisitions (inclusive of the School District's property), and $22,199,182 to final design and engineering management services contracts, agency costs, and construction management support services contracts.

### D.    The Draft SEIS Intentionally Fails to Address the Agencies' Irrevocable Financial and Contractual Commitments

57.    On June 2, 2017, Metro and the FTA issued the DSEIS.  The draft environmental evaluation reaffirmed the Agencies' selection of the Project Alignment, which requires the construction and operation of subways tunnels directly beneath the High School campus's Building B1, a historic building only lightly reinforced and susceptible to exterior cracking, and Building C, a planned gymnasium with underground parking facilities that increase community access to the High School's recreational facilities.    Additionally, the DSEIS changed the location of the Project Staging Area identified in the 2012 FEIS from Staging Area 1, located directly adjacent to the planned station entrance, to Project Staging Areas 2 and 3, located significantly farther from the station and at the High School's fence line.  This meant that the Agencies now intended to conduct substantial construction activity directly across from the High School's athletic fields and portable classrooms.

58.    The DSEIS did not reveal the Agencies' substantial financial, contractual, and bureaucratic commitments to the Project Alignment and Staging Areas.  Locked into their choice of the Project Alignment and Staging Areas due to these irrevocable commitments, the Agencies concluded without basis that the construction and operation of the Project Alignment beneath the High School's campus would have a *de minimis* impact on the campus's Section 4(f) resources.

COMPLAINT

Reasoning backwards from a predetermined result, the DSEIS concluded that there were no feasible and prudent alternatives that would avoid the campus's Section 4(f) resources or least possible harm alternatives to the Project Alignment.  In it, the Agencies determined without proper analysis that alternatives to the Project Alignment were "less effective than the [Project Alignment] in meeting the purpose and need, resulted in other adverse impacts, or resulted in a substantial difference in cost."

59.    The DSEIS also wrongly concluded that Project Staging Areas 2 and 3 "minimize[] impacts to the community" and "optimize[] construction efficiency," contradicting the Agencies' statement in the 2012 FEIS that "[u]sually, [ ] construction staging areas and laydown areas are located at station sites to facilitate access to the tunnel."  The Agencies' proposed staging areas, which generate harmful levels of toxins, noise, and vibration, pose a substantial threat to the High School's learning environment and the health of its students, faculty, and community.  Incredibly, despite the Staging Area's use of the High School's 4(f) resources, the DSEIS did not conduct an analysis of feasible and prudent alternatives.  Instead, the Agencies summarily dismissed without any analysis Staging Area 1 (which would have substantially mitigated these harms and which the Agencies had previously selected as the Project Staging Area) as "unavailable" because of a developer's purported future plans, placing the developer's interests over the public health of students, faculty, and community members that use the High School.  The true, unlawful reason for this was not disclosed:  Metro had already acquired the property for Staging Areas 2 and 3.

60.    Thus, to hide the extent of the Agencies' predetermination in favor of the Project Alignment, the DSEIS did not disclose FTA and Metro's billion dollar contractual commitments to the Project Alignment.  Nor did the DSEIS disclose acquisition of property or any other financial commitments made toward constructing the Project Alignment. These facts, however, would soon be revealed

COMPLAINT

as the result of Metro's unlawful refusal to consider feasible and prudent alternatives to the Project Alignments.

### E.   The Agencies' Predetermination In Favor of the Project Alignment and Staging Areas Is Revealed

61.     In June 2017, the School District proposed several alternative alignments that would cause less harm than the Project Alignment.  Dubbed the "Linden Alternative," "McCarty Alternative," and "Camden Alternative" (collectively, the "Proposed Alternative Alignments"), the proposed alignments minimize harm to the High School's campus and its Section 4(f) resources while posing no corresponding harm to the Project or future commuters.  The Proposed Alternative Alignments protect historic Building B1 and enable the School District both to build Building C as designed and to realize the completion of its Master Plan to the benefit of the entire Beverly Hills community.  Each of the Proposed Alternative Alignments permit the Project to maintain a Constellation Station location, varying only slightly the route to that station.  In each case, the alignment would still travel across the High School campus, but would not proceed under current historic or proposed recreational buildings.  These alternatives are a win-win for various Project goals.  They generally are in line with the costs and travel time associated with the Agencies' Project Alignment and do not pass under the historic Perpetual Savings Bank.

62.     In response to the School District's submission of proposed alternatives, on July 6, 2017, Metro's CEO, Philip Washington, stated in a letter to School District consultant Hon. Rudy Svorinich, Jr. that contracts and other financial commitments entered into by Metro eliminated the Agencies' ability to consider even minor alterations to the Project Alignment or the Project Staging Areas, much less the alignments proposed by the School District.  Thus, in contravention of the District Court's order that the Agencies cannot rely on the execution of the FFGA or design/build contract, or any inertia caused thereby, to support the suitability of

COMPLAINT

their remand analysis, the Agencies expressly refused to consider feasible and prudent alternatives due to their irrevocable commitments in favor of the Project Alignment and Staging Areas.

63.    Specifically, in his letter, Mr. Washington first asserted that Metro could not consider the School District's proposed alignments, because Metro had issued a "notice to proceed" to its design build contractor to begin construction on the Project Alignment, and it would be too costly and cause too much delay for Metro to consider these feasible and prudent alternatives.  He wrote:

> A Notice to Proceed with construction of the Section 2 stations and tunnels was issued to the design build contractor on April 26, 2017, [and] [a] delay to this contract would delay regional transit improvements to Los Angeles County and cost Metro conservatively $6 million per month ($72 to $108 Million for 12 to 18 months).

64.    Moreover, Mr. Washington's letter revealed Metro's acquisition of all three parcels of real estate required for Project Staging Areas 2 and 3, which were not previously disclosed to the public, including in the DSEIS.  Specifically, Mr. Washington informed the School District that Metro could not consider the School District's Proposed Alternative Alignments because "the proposed alignments are not directly above the tunneling shaft currently planned at the AAA property (1950 Century Park East) . . . . Metro has acquired the AAA property, the adjacent site (1940 Century Park East) to the north, as well as the 2040 Century Park East site . . . . to support tunnel operations."  Metro's acquisition of real estate for its Project Staging Areas, thus, prevented it from considering any alternatives to the Project Alignment.  These commitments also prevented Metro from considering feasible and prudent alternatives to the Project Staging Areas themselves – despite the fact that they posed a substantial threat of harm to the High School and its community.

65.    On July 7, 2017, one day after Mr. Washington's letter, Los Angeles County Supervisor Shelia Kuehl called School Board President Melvin Spitz to inform him that Metro could not, and would not, consider feasible and prudent alternatives to the Project Alignment proposed by the School District. Supervisor Kuehl told Mr. Spitz that she had a two-hour meeting with Mr. Washington and Metro senior construction staff. The purpose of the meeting between had been to discuss the School District's proposed alternative subway tunnel alignments.

66.    Supervisor Kuehl informed Mr. Spitz that because Metro had "already lined up" various properties along its intended route it could not change the Project Alignment, because it would purportedly delay the project by 2 or 3 years.

67.    Metro's acquisitions of property and reliance on prohibitive costs of changing the alignment under the design/build contract demonstrate that they irrevocably committed themselves to the Project Alignment and Project Staging Areas prior to completing the environmental analysis, as a legal matter undermining the objectivity of their review. Moreover, as the FTA's disbursement awards reveal, the FTA was fully aware that Metro was using federal funds for final design work and property acquisitions, disbursed these funds anyway in violation of NEPA regulations and FTA policy, and failed to prohibit Metro from prejudicing the consideration of alternatives.

68.    Metro's letter and other statements revealing its predetermination highlight the importance of looking beyond the SEIS to determine whether the Agencies have pre-judged their supplemental environmental review. Indeed, the fact that the Agencies did not reveal their contractual and financial commitments, property acquisitions, disbursements and expenditures in furtherance of the Project Alignment and Staging Areas in their environmental analysis demonstrates—as courts have warned—that focusing on the environmental alone could fail to detect predetermination in cases where the agency has irreversibly and irretrievably committed itself to a course of action, but where the bias is not obvious from the

COMPLAINT

1    face of the environmental analysis itself.

2    ### F.    The School District Responds to the DSEIS

3        69.    On July 24, 2017, the School District and the City of Beverly Hills (the

4    "City") formally responded to the DSEIS in  detailed comment letters.  The School

5    District's and the City's written comments were supported by the opinion letters of

6    well-qualified experts in the fields of structural, transportation, and geotechnical

7    engineering, atmospheric and air quality science, and educational facilities

8    administration, regulation, and management.

9        70.    In its letter, the School District, which had previously voiced its

10   concerns about the DSEIS at a public hearing conducted by Metro on June 22, 2017,

11   informed the Agencies that the DSEIS did not objectively, fairly, or adequately

12   evaluate the harm to the High School, its students' health or learning environment,

13   its historical and recreational buildings and facilities, its planned educational and

14   recreational facilities, or the harm to the broader community of Beverly Hills arising

15   from the Project Alignment and Staging Areas.  The DSEIS also did not fairly

16   consider feasible alternatives, because the Agencies had already wrongfully

17   committed -- contractually, financially, and bureaucratically -- to a predetermined

18   conclusion.

19       71.    The School District apprised the Agencies that they failed to undertake

20   the requisite hard look and wrongly concluded in the DSEIS that the Project

21   Alignment will have a *de minimis* impact on the High School's Section 4(f)

22   resources.  It warned that, contrary to the Agencies' preliminary determination, the

23   Project Alignment would result in substantial harm to the High School's campus and

24   community.  The School District informed the Agencies that the DSEIS failed to

25   account for, among other things, the impact of the Project Alignment on the School

26   District's Master Plan for the modernization of the High School campus, particularly

27   its expanded recreational facilities and Building C, the planned gymnasium with an

28   underground parking structure to increase community access to these recreational

26

facilities.  Likewise, the DSEIS failed to assess the harm caused by tunneling beneath the High School's historic Building B1.

72.     In its letter, the School District also detailed that the DSEIS wrongly concluded, based on an inadequate and biased review, that there are no feasible and prudent alternatives to the Project Alignment.  The School District set forth its three Proposed Alternative Alignments -- the Linden, McCarty, and Camden Alternatives -- that each protect historic Building B1, enable construction of Building C as designed, and complete other aspect of the Master Plan to the benefit of the entire Beverly Hills community.

73.     The School District's and the City's letters also explained that the DSEIS also incorrectly concluded that the Agencies' planned placement of construction staging areas on the High's School's fence line across from the High School's recreational facilities do not constructively use these facilities.  As detailed in those letters and as set forth below, these staging areas will generate harmful levels of airborne toxins, noise, and vibration, and pose a substantial health risk to the High School's students, faculty, staff, and community members using the High School's facilities.  The School District and the City pointed out that the DSEIS improperly rejected a feasible and prudent alternative to Staging Areas 2 and 3.  Staging Area 1, located 500 feet from the fence line of the High School's campus, greatly reduces risk to student and faculty health, as well as the disruptive noise of a construction site at the boundary of campus.

## G.     The Agencies' Predetermination Infects the FSEIS

74.     On November 22, 2017, the Agencies issued the Supplemental ROD and FSEIS.  The myriad analytical flaws and misrepresentations in the FSEIS, which are detailed below, make clear that the Agencies' irrevocable commitments have improperly infected their environmental analysis in favor of a predetermined conclusion in favor of the Project Alignment and Staging Areas.  As discussed in detail below, the FSEIS makes the following predetermined and erroneous

COMPLAINT

conclusions:

- The Project's use of the High School's 4(f) resources is de minimis;

- The Project Alignment will cause less harm to 4(f) resources than the School District's proposed Linden, McCarty, and Camden Alternatives;

- The construction activities at the Project Areas will not constructively use the High School's 4(f) resources;

- Staging Area 1 is "not available" as a feasible and prudent alternative to the Project Staging Areas;

- Toxic emissions and particulates from the Project Staging Areas will not adversely affect the health of the High School's students, faculty, and community;

- Noise and vibration from the construction activities will not adversely affect children's learning and education;

- Abandoned oil wells and methane on the High School campus do not pose a significant risk to the High School's students, faculty, and community; and

- There are active faults preventing a subway station at Santa Monica Boulevard.

75.     The Agencies' rejection of the Linden and Camden Alignments is particularly egregious.  Section 4(f) requires the FTA to approve the alternative that causes the least overall harm in light of the statute's preservation purposes. The Agencies rejected the Linden and Camden alternatives because they purportedly pass beneath protected Section 4(f) properties.  They identify these properties as "Tract 7710 Residential Grouping," which were identified by the City of Beverly Hills as a potential National Register of Historic Places ("NRHP")-eligible historic district in a 2004 Historic Resources Survey Report.  The potential historic district's boundaries are Gregory Way, El Camino Drive, the alley north of

Olympic Boulevard, and the first row of properties west of Linden Drive.

76.    The SEIS states that the tract contains a "highly representative grouping of residential architecture designed primarily in the Spanish Colonial Revival style in Beverly Hills in the 1920s and 1930s."  The majority of residences are "amply-sized, two-story homes that are typically rectangular or L-shaped (with courtyard) in plan," with "Spanish Colonial Revival styling" as its unifying feature. Conveniently, the FSEIS does not contain an overlay of the Alignments upon the historic district.

77.    In reality, the Linden and Camden Alignments run beneath only a single property -- 301 South Linden Drive -- within the boundaries of the purported historic district.  The "historic" home that was once situated on that property, however, was demolished and rebuilt in a modern design in 1998 and has none of the Spanish Colonial Revival characteristics of the homes in the historic district. Indeed, the 2004 Historic Resources Survey Report upon which the Agencies rely reveals that 301 South Linden Drive is neither individually potentially NRHP-eligible nor as a contributor to the historic district.  The Agencies' use of this specious "historic" property to reject the Linden and Camden Alignments as less harmful alternatives to the Project Alignment demonstrates that their 4(f) analysis was little more than a pretense conducted to reach a predetermined result.  Indeed, the Agencies' consideration of this property as a purported additional Section 4(f) impact violates the FTA's longstanding Section 4(f) policy that when a project requires land from a non-historic or non-contributing property lying within a historic district and does not use other land within the historic district that is considered contributing to its historic significance, there is *no direct use* of the historic district for purposes of Section 4(f).

78.    Additionally, the FSEIS, like the DSEIS, does not reveal the extent Agencies' financial, contractual, and other commitments in furtherance of the Project Alignment and Staging Areas.  Instead, in Appendix J, the FSEIS

conclusorily states, "The changes to the design-build contract and t[he] costs Metro would incur due to the schedule delays if changes were made to the Project were not considerations in the decision-making process." This statement contradicts the statement immediately before it that "any change to the alignment would result in a delay of project completion due to additional environmental analysis and design need." More importantly, this statement is belied by Mr. Washington's letter and Metro's statements outside the FSEIS that Metro could not consider the School District's proposed alignments because a Notice to Proceed with construction had been issued and a change to the contract would cost Metro $72 to $108 million for a 12 to 18 month delay, and because Metro had already acquired the Project Staging Areas and lined up properties along the Alignment. Nor did the FSEIS reveal that the FTA disbursed to Metro federal funds specifically for property acquisition and final design work on the Project Alignment while the SEIS process was ongoing, and otherwise sanctioned activities that limited the Agencies' choice of alternatives, in contravention of the statute's requirement that the FTA must prevent Metro from engaging in such activities. Thus, irrespective of any facial regularity of the agency's NEPA analysis, the court should not ignore this relevant evidence that the Agencies violated the procedures established by NEPA, thereby contravening the statute's overarching purpose.

79.    In sum, the Agencies' irrevocable commitments have predetermined the outcome of the FSEIS. In addition to entering into binding billion dollar contractual commitments to build the Project Alignment, the FTA has disbursed and Metro has spent hundreds of millions of dollars in federal funds for the Project Alignment and Staging Areas while the supplemental environmental review process was pending, including to purchase property along the right of way, fund relocations of residences and businesses, perform utility relocations and demolitions, and engage design and engineering services for the Project Alignment. The FTA was well aware that Metro intended to use federal funds for

property acquisitions and final design work, but nevertheless unlawfully disbursed the funds for this purpose, prejudicing the consideration of alternatives. As the Agencies' flawed analysis in the FSEIS demonstrates, these irrevocable contractual and financial commitments have prevented the Agencies from conducting a fair and unbiased analysis of the environmental impacts of the Project Alignment and Staging Areas.

80. Based on the issuance of this flawed and pre-judged FSEIS and SROD, Metro has now commenced the acquisition process for a subsurface easement beneath the High School property. On or about December 11, 2017, Metro delivered to the School District a notice of intent to appraise together with an Acquisition Information Brochure, which are statutory prerequisites to Metro's acquisition of the School District's property for the Project under Cal. Gov't Code §§ 7267.1(b) and 7267.2(a). This acquisition work is being undertaken with federal funds received under FFGA disbursements and is ongoing, notwithstanding Metro's knowledge that the School District intended to challenge the FSEIS and the SROD.

## II. THE AGENCIES WRONGFULLY SELECT THE PROJECT ALIGNMENT AND FAIL TO PROPERLY CONSIDER THE <u>PROPOSED ALTERNATIVE ALIGNMENTS</u>

### A. The FSEIS Wrongly Concludes the Project Alignment's Use of <u>the High School's 4(f) Resources is De Minimis</u>

81. Contrary to the Agencies' unsupported conclusion, the Project Alignment's impact on the High School's Section 4(f) resources is not *de minimis*. It is substantial. The Project Alignment, among other things, will undermine the School District's Master Plan, harming Section 4(f) recreational facilities, and it may undermine the structural integrity of Building B1, a Section 4(f) historic property.

#### 1. <u>Harm to Section 4(f) Recreational Facilities</u>

82. The School District's Master Plan for the rehabilitation and modernization of the High School's campus, which is vital to meeting the present

and future needs of a growing Beverly Hills community, is well under way. Students have been relocated into portable classrooms, abatement of asbestos and demolition has started, and project teams have been assembled for the commencement of construction. The next step is to begin excavation for a new gymnasium facility, Building C, which will serve the recreational needs of both students and the greater community.

83. Building C has been designed to include vital underground parking in the center of campus for the specific purpose of providing the community with access to the High School's recreational facilities—which are principally located on the southeastern side of the campus, far from any sufficient parking options. With the construction of Building C, the existing Konheim Gymnasium will be demolished to build an expanded code-compliant track and field that will also serve both students and the community. In a subsequent phase of the Master Plan, an outdoor Olympic-sized swimming pool will be added, again for community-wide use, to the southeast side of the Swim-Gym.

84. The close proximity of Metro's planned tunnels to new buildings raises numerous technical and regulatory concerns. The FSEIS fails to note or even consider the impact of Metro's standard tunnel easement language on the School District's expansion plans, particularly Building C, which is a Section 4(f) recreational facility. If Metro proceeds with eminent domain beneath the High School prior to construction of Building C, Metro would dictate whether the School District can build Building C at all. As the grantor, Metro would be empowered to prevent any building it deems would interfere with, damage, or endanger Metro's subway tunnel or its excavation, construction, maintenance, replacement, enjoyment or use. Nor does the FSEIS include a commitment from Metro that it would waive its power to veto the construction of Building C under its standard easement language. Without such commitment, Metro would have a unilateral veto over the School District's ability to construct Building C.

85.     The footings of Building C will pass critically close to Metro's planned subway tunnels and will rest approximately 8.5 feet from the tunnels' ceiling at the closest point.  Yet, without any design or engineering analysis, the FSEIS determines that Building C is compatible with the subway tunnels and can be constructed with "up to four floors of underground parking with a mat foundation with approximately 10 feet of clearance to the top of the tunnels."  Engineers retained by the School District, however, have identified several problems with using a mat foundation given Building C's "relatively large and variable column loads."

86.     Moreover, in the FSEIS, the Agencies essentially sidestep the question of the design compatibility of the subway tunnels and Building C, stating only that the Agencies will collaborate with the School District at a later date to develop a mutually agreeable design structure for Building C and that the California Division of State Architect ("DSA") has "offered to work with both parties to mediate a design solution."  However, such a delay of crucial questions raised by the Project Alignment is an obvious means by which the Agencies sought to avoid properly weighing the true impact of the Project Alignment on the School District, and in particular on its Section 4(f) resources, against other alternatives.  While the Agencies state that any additional costs from the re-design "would be covered through negotiations of the subsurface easement," this is far from a promise to cover all costs that the School District would incur as the result of the Agencies' unfounded and improper choice to run the tunnel directly underneath Building C.

87.     Notably, the Agencies omit from this discussion the manner in which they actively subverted DSA approval of the School District's designs for Building C.  At the time the Master Plan and current design approvals were being obtained for the High School campus renovation, there was no reason to consider or address subway tunnels.  The Master Plan was consistent with what the School District and the public knew about planned Westside Purple Line Extension—that it would proceed along Santa Monica avoiding the School.  By the summer of 2017, the

COMPLAINT

School District had submitted excavation and grading plans for Building C to the DSA, and it was anticipating DSA approval of those plans so that it could begin work.

88.    In late August 2017, however, two Metro representatives, Roger Martin, a Senior Transportation Planning Manager, and Amanda Elioff, a Senior Supervising Engineer with Metro's engineering firm Parsons Brinckerhoff, visited Douglas Humphrey of the DSA to discuss the School District's plans for construction of Building C.  During the meeting, Metro persuaded DSA that Building C will interfere with the Metro's planned tunnel alignment.  In response to Metro's visit, on September 5, 2017, Mr. Humphries told the School District that DSA has put the approval process for Building C on hold.

89.    Metro's decision to interfere with the approval process for Building C contradicted its official position -- set forth in both the DSEIS and now in the FSEIS -- that Building C is compatible with the tunnel alignment.  The Agencies clearly have concluded, contrary to their public statements, that Building C and the Project Alignment are not compatible, or at least not easily compatible, and their actions demonstrate that their true intent is to block the construction of this vital recreational facility.

90.    Further, the FSEIS does not consider the impact of the additional costs associated with implementing the type of foundation design the Agencies propose as part of their Section 4(f) alternatives analysis – thereby understating the cost of the Agencies' Project Alignment.  It also does not consider whether the collaboration and mediation process the Agencies outline (including obtaining an agreement on the easements required from the School District in order to proceed with building the Project) would delay the campus modernization to the detriment of the educational and recreational needs of the Beverly Hills community.

91.    To excuse the Agencies' failure to conduct an adequate Section 4(f) analysis, the FSEIS also wrongly contends that Section 4(f) does not apply to the

COMPLAINT

entirety of Building C, because Section 4(f) protections do not apply to subsurface parking for a property with multiple uses.  The Agencies rely on an inapposite section of the Department of Transportation "Section 4(f) Policy Paper," which they claim indicates that "[f]uture development rights, including the development of subsurface parking for a property with multiple uses, are not a Section 4(f)-protected feature."  The section of the policy paper on which FTA and Metro rely, however, is inapplicable here as it applies to "multiple-use land holdings" that are "vast in size," such as "National Forests, State Forests, [and] Bureau of Land Management lands."  This portion of the policy paper contemplates that the non-Section 4(f)-protected use occurs in a physical location entirely removed from the Section 4(f)-protected part of the property, such that treating the spaces differently is feasible, not a situation like the one here, where the purported "multiple-use" is part of the same structure.

92.    Even assuming that the Agencies are permitted to subdivide a building, Section 4(f) does not permit them to ignore entirely the consequences of the Project Alignment on the parts of the building that are not protected under Section 4(f).  For example, Section 4(f) regulations provide that the Agencies must consider, "[a]fter reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f)."  In addition, the Agencies ignore that the primary purpose of the underground parking is to allow increased community access to the expanded recreational facilities on the east side of the campus.

93.    The Project Alignment also undermines the balance of the High School's modernization plan.  After a decade of planning, environmental review, $11 million in design fees, and considering the already undersized nature of its athletic fields, the School District is extraordinarily limited in its ability to build on its campus.  The School District does not have any viable alternatives to the planned location of Building C.

COMPLAINT

94.    The loss of Building C will have a cascading effect that will undermine the School District's ability to meet the future educational and recreational needs of its community.  If Building C cannot be built, the remaining recreational expansion of the campus cannot take place because, as is expected on a tight urban campus, each phase of construction is dependent on the completion of the prior one.  As one example, the track cannot be expanded unless the Konheim Gymnasium is demolished, and the Konheim Gymnasium cannot be demolished until the new gymnasium, Building C, is constructed.  If the School District is forced to abandon Building C altogether and maintain the Konheim Building instead, the School District would be unable to build the planned full-size track and field and Olympic-sized outdoor swimming pool, and its severe parking problems, which undermine community access to recreational facilities, will go unremedied.  The High School's students and the public would be deprived of needed and desirable athletic and recreational venues.

### 2.    Harm to Section 4(f) Historic Structures

95.    The Agencies fail to properly assess the risk of harm caused by differential ground settlement and movement beneath High School's Building B1, a Section 4(f)-protected historic property.  Metro plans to tunnel directly underneath the building, and ground settlement caused by its planned boring activities poses a significant risk of cracking in the building's exterior.

96.    The Agencies' FSEIS understates the risk of soil settlement in excess of 0.5 inches below Building B1, and it failures to consider how soil settlement would interact with Building B1's reinforcement structure.  As a result, the Agencies wrongly conclude that "tunneling with a pressurized-face tunnel boring machine [under Building B1] would not cause significant ground settlement that would result in structural damage to the historic building."

97.    To reach this determination as it relates to the amount of soil settlement on the High School campus, the FSEIS deviates from standards it purports to rely on

COMPLAINT

to determine the acceptable amount of soil settlement.  As stated in the Century City Area Tunneling Safety Report, a volume loss of "0.5 to 1.0 percent values [] have been used to estimate ground loss for Metro Projects."  Appendix B to the FSEIS also indicates that the standards employed for calculating "[s]urface settlements along the Project's alignment" involved using "surface volume losses of 1 percent and 0.5 percent."  The surface settlement results for the High School campus as presented in this appendix, however, are not based on the use of these benchmarks, but rather reflect the use of volume losses of less than 0.5 percent in order to manufacture a "surface settlement[ ] of less than 0.5 inch."

98.    Additionally, although the Project will build two tunnels next to one another, the FSEIS fails to consider the combined settlement of the two bores.  The FSEIS only indicates the surface settlement of each individual bore and does not consider the combined effect of both tunnels.  Moreover, the FSEIS cites to inapposite examples of projects that had less than 0.5 percent ground loss.  For example, the Oregon CSO single bore tunnel did not build two bores next to one another as the Project will.  Additionally, the MGLEE project, another example, had tunnels four feet smaller in internal diameter than that of the Project's tunnels.

99.    Due to the age of the structures within the campus, an assessment considering the combined settlement should have been calculated directly under the campus's structures.  Moreover, the volume loss should have been checked against the standard – 0.5% to 1.0% – defined by Metro. Tunneling engineers retained by the School District have determined that combined surface settlements of greater than 0.5 inch on the High School campus are expected to result from a 0.5 percent volume loss, which is in excess of the acceptable limit that the FTA and Metro established.

100.    Given the fact that the footings of Building B1, constructed in 1926, are lightly reinforced, the anticipated amount of ground settlement poses a significant risk that the soil under Building B1 will not continuously support its wall footings.

COMPLAINT

1  This lack of support would result in the bottom of the footing cracking, and the
2  cracking likely would spread to the exterior of the historic Building B1.  The
3  Agencies' finding of *de minimis* impacts to Building B1 was erroneous and led them
4  to wrongly conclude that "there is no requirement for avoidance or further
5  minimization [of adverse impacts]."

## B.    The FSEIS Improperly Rejects Less Harmful Alignments

101.    The Agencies failed to adequately consider the Proposed Alternative
Alignments.[1]  The Project Alignment will "use" the High School's 4(f) resources by
threatening the High School's historic structures and harming its recreational
facilities.  Therefore, the Agencies are prohibited from selecting Project Alignment
unless there are no feasible and prudent alternatives and no available alternatives
that cause less overall harm.  The Agencies also must undertake all possible planning
to minimize harm to the School District's 4(f) resources.

102.    Each of the Proposed Alternative Alignments causes less overall harm
than the Project Alignment.  They would have no adverse impact on the construction
of the tunnel or the future operation of the subway line, and they avoid the harm to
the High School's community and Section 4(f) properties posed by the Project
Alignment.  The Agencies, thus, were under a duty to fairly analyze and consider
these alternatives, and their failure to adequately do so is fatal to their selection of
the Project Alignment.

103.    Standard practice for analyzing competing alternatives for major
infrastructure projects, including in the context of evaluating least overall harm,
typically uses a point system for allocating different weights to the impacts of each
alternative.  Yet, evidencing the Agencies' predetermination in favor of the Project
Alignment, the FSEIS includes no such point system.  Due to their substantial

---

[1] The merits of these alternatives was specifically brought to the Agencies' attention in the School District's Comment Letter.

COMPLAINT

financial commitments in favor of the Project Alignment and Staging Areas, the Agencies had no interest in weighing alternatives.  They simply reasoned backwards from a predetermined result.

104.   For example, the "Review of the Alternatives proposed by the Beverly Hills Unified School District" in Appendix L to the FSEIS (the "Appendix L Review"), in which the Agencies examine their Project Alignment against the School District's Proposed Alternatives, purports to compare the "Square feet of tunneling under historic property" for each of the alternatives.  Notably, the Agencies' Project Alignment is claimed to tunnel under fewer square feet of historic property ($56,292$ ft$^2$) than each of School District's Proposed Alternatives (each claimed to be in excess of $71,800$ ft$^2$).  Yet, nowhere in Appendix L, or anywhere in the FSEIS, do the Agencies explain how they arrived at the numbers.  As detailed herein, the Agencies falsely claim that the Proposed Linden and Camden Alternative Alignments run beneath historically-protected Spanish Colonial Revival style homes, when they do not.  Additionally, none of the School District's Proposed Alternatives tunnel underneath Building B1 on the School District's property, while the Agencies' Project Alignment does.  Clearly, the Agencies' analysis is flawed, and, at minimum, the Linden and Camden Alternatives run beneath fewer historic properties than the Project Alignment.  Yet, the Agencies rely on this specious analysis in their selection of the Project Alignment over the Proposed Alternatives.

105.   Other criteria relied upon by the Agencies similarly demonstrate that the Agencies did not evaluate in good faith the alternatives proposed by the School District.  Instead, the Agencies appear to have searched for and invented reasons to reject the School District's Proposed Alternatives so as to not disturb their decision to proceed with the Project Alignment.

106.   This biased evaluation is evidenced in part by the fact that the "Least Overall Harm" table begins with the premise that "[t]he Project would generate the least overall harm" and highlights for each alternative any criteria that "indicates

greater impact or worse performance than the Project" but does not similarly illuminate instances in which an alternative would result in *lesser impact* or *improved performance*.

107. The Agencies' failure to properly consider the School District's Proposed Alternatives is highlighted by the FSEIS' evaluation of the Section 4(f) historic properties the School District's Alternatives would allegedly tunnel beneath.

108. As set forth above, to support its improper rejection of the School District's Alternatives, the Agencies purport to rely on a 2004 City of Beverly Hills Historic Resources Survey Update in order to manufacture an additional Section 4(f) historic property, which the agencies call the "Tract 7710 Residential Grouping," under which each of the School District's Proposed Alternatives would tunnel. Having done so, the Agencies then falsely conclude that "the Project crosses under the fewest . . . historic properties" so as to support their predetermined choice in favor of the Agencies' Project Alignment.

109. But, for the Camden and Linden alternatives, the claim that they implicate National Register of Historic Places ("NRHP") eligible properties is unsupportable and entirely manufactured by the Agencies' consideration of the Tract 7710 Residential Grouping as a whole rather than considering the specific properties within this area implicated by the Camden and Linden alternatives.

110. While, the Agencies acknowledge in the FSEIS that there "may" be specific properties within "this residential grouping that may be *individually* eligible or contributing elements" (emphasis added) to the claimed historic district, their analysis is overly inclusive and designed to justify their desired and predetermined result.

COMPLAINT

111.    The FSEIS conspicuously does not include a map showing the School District's Alternatives within the claimed historic district, which, as shown below, would have demonstrated that the Camden and Linden alternatives cross under only *one* property within the claimed historic district.



112.    Moreover, the City of Beverly Hills report, on which the Agencies rely, confirms that the Camden and Linden alternatives will not cross under a single NRHP eligible property within Tract 7710 Residential Grouping.

113.    The single property that the Linden and Camden Alternative pass under is 301 South Linden Drive.  In noting changes to the status of certain properties, the City's 2004 Historic Resources Survey Report reveals that, while 301 South Linden Drive was once recognized as a NRHP eligible contributor to the historic district, the home at that property was "[d]emolished" and rendered ineligible for NRHP status, either individually or as a contributor to the historic district.

114.    In fact, the home at 301 South Linden Drive was built in 1998 by Belzberg Architects, and one look at the home shows that it has none of the

COMPLAINT

characteristics of the Spanish Colonial Revival style homes that make the Tract 7710 Residential Grouping a potential historic district.



(https://www.flickr.com/photos/michael_locke/32197403972)

115.   Evidencing the Agencies' predetermination toward rejecting feasible and prudent alternatives, the Agencies ignored all of this information.  Instead, they intentionally crafted their analysis to create the false impression that each of the School District's Alternatives has a significant impact on the NRHP-eligible historic properties within the Tract 7710 Residential Grouping.  Indeed, the Agencies' consideration of the this property for invaliding the Linden and Camden Alignments violates the FTA's longstanding Section 4(f) policy that when a project requires land from a non-historic or non-contributing property lying within a historic district and does not use other land within the historic district that is considered contributing to its historic significance, there is *no direct use* of the historic district for purposes of Section 4(f).

116.   Other criteria used by the Agencies in evaluating the School District's Proposed Alternatives similarly demonstrate predetermination in favor of the Project Alignment.  For example, the Agencies acknowledge that the Camden Alternative proposed by the School District costs $20,000,000 ***less*** than the Project Alignment.  This cost difference would be even greater had the Agencies not underestimated the

cost of the Project Alignment by failing to take into account the millions of additional dollars that will be necessary to construct Building C in a manner compatible with the subway tunnels. The Agencies also acknowledge that each of the School District's Alternatives would require acquisition of fewer commercial subsurface easements than the Project Alignment. However, neither of these facts seem to have been given any weight in favor of the School District's Alternatives.

117. To reach their predetermined outcome in favor of the Project Alignment, the Agencies both manufacture and mischaracterize impacts of the School District's Proposed Alternative Alignments. For example, the FSEIS states that "[w]hile the Camden Alternative would be less costly than the Project, it would have a greater potential to encounter abandoned oil wells and would require substantially more residential subsurface easements than the Project."

118. With respect to the latter statement, the Agencies misrepresent the need to acquire easements for the Camden Alignment, as they do not mention that it will reduce the number of commercial easements necessary by six. Also, the number of additional residential easements that would need to be obtained for the Camden Alignment is only 27. While the Agencies call this difference substantial, it is not the type of difference that constitutes the sort of "unique problem," "truly unusual factor," or "costs or community disruption of [an] extraordinary magnitude" that support rejecting the Camden Alternative.

119. The degree to which this difference of 21 total additional subsurface easements is not "substantial" is demonstrated by the Standard Cost Category estimates that the Agencies performed for the Camden Alternative, which reflects that the Agencies anticipate the cost of acquiring subsurface easements for the Camden Alternative to be *identical* to that the Agencies' Project Alternative.

120. As to the chance of encountering abandoned oil wells along the High School's property, the Agencies focus on the wrong criteria. Instead of focusing on how near or far a particular alignment runs from a mapped (or unmapped) oil well,

43

the focus should instead be on what is at the surface were an oil well to be encountered.  The Agencies acknowledge that "[l]ocating and removal of abandoned oil wells is most efficient from the surface," and they also contemplate the possibility of undertaking "shallow excavations" to investigate anomalies when searching for wells.  Remarkably, the Agencies do not consider the difficulties of carrying out these tasks were there a building at the surface.  This is a distinct possibility with the Project Alignment, since it tunnels under buildings on the High School's campus, which sits atop an active and long used oil field.  This risk is mitigated, however, by the School District's Proposed Alternative Alignments, which run under open and undeveloped fields and buildings that are already slated to be demolished as part of the High School's Master Plan making.

121.    Further undermining the Agencies' analysis concerning abandoned wells is the fact that they still have not explained the basis for their use of a 200 feet as the benchmark by which actual well locations could differ from the mapped location.  Additionally, while the Agencies claim in their least overall harm analysis that the closest abandoned oil well on the High School campus to the Project Alignment is 230 feet, elsewhere in the FSEIS, the Agencies state that the closest abandoned oil well on the High School campus is approximately 35 feet away.

122.    Several of the other factors analyzed by the Agencies similarly do not justify rejecting the School District's Alternatives.  For the Camden Alternative, for instance, the Agencies highlight that it will result in additional travel time of only *two seconds* per ride.  An additional two seconds of travel time cannot justify rejecting the Camden Alternative.

123.    Additionally, the Agencies note that, as part of the "Construction Phases Impacts to 4(f) Properties," injection grouting would be needed for the School District's Alternatives, whereas it would not be needed for the Agencies' Project Alignment.  Specifically, they state that such grouting is necessary to minimize "ground subsidence during construction" in connection with the

COMPLAINT

construction of the additional cross-passage. The additional cross-passage is required because of the length added to the alignment under the School District's Alternatives. However, given the depth of the tunnel at the location at which the cross passage will be constructed, there will negligible settlement from the construction of the cross-passage and any settlement would not be noticed. Thus, it is extremely unlikely that injection grouting would be required in connection with constructing any of the School District's Alternatives.

124. Additionally, while the Appendix L Review reflects that the Camden Alternative (as well as the other alternatives proposed by the School District) has a smaller curve radius than the Agencies' Project Alignment, the Agencies admit later in the same document that this radius "may be acceptable" as it exceeds 750 feet. Thus, it does not provide a justifiable basis to dismiss any of the School District's Alternatives.

125. The same is true of the fact that the Agencies claim, in the Appendix L Review, that each of the School District's Alternatives would result in the tunnel access shaft encroaching onto the AT&T property. That this encroachment would result in demolishing a portion of the parking garage and parking garage foundation on that property is of no moment, as the Agencies disclose in Appendix H to the FSEIS that they already intend to acquire a construction easement for the AT&T property and the FSEIS reveals that the Agencies already intend to demolish the parking structure on that property after the acquire it. Thus, the School District's Alternatives result in no difference to the plans that the Agencies have already made for the AT&T site.

126. Lastly, the FSEIS improperly dismisses the opinion of the officials with jurisdiction over the Section 4(f) recreational properties on the High School's campus in favor of the Agencies' Project Alignment. The Agencies acknowledge that the School District is the official with jurisdiction over these properties. However, the Agencies barely feign to weigh the School District's preferences,

COMPLAINT

claiming summarily that they have "weighed" the School District's preference that the alignment proceed under the future track and future baseball field and avoid the historic buildings.

127. Indeed, if the Agencies have "weighed" the School District's preferences, they have done so in a manner that is adverse to those preferences. In particular, when conducting the Section 4(f) analysis, the Agencies classified the impacts of the School District's Alternatives on the future track and future baseball field as evidence of those Alternatives having a "greater impact or worse performance than the Project," rather than weighing these effects as positives in line with the School District's preferences.

## III.   THE AGENCIES' IMPROPER SELECTION OF STAGING AREAS 2 AND 3

### A.   Construction at the Project Staging Areas will constructively use the High School's 4(f) resources.

128. The Agencies' planned placement of the Project Staging Areas – designated as Staging Areas 2 and 3 – directly across from the High School's recreational facilities represents a constructive use of the High School's Section 4(f)-protected resources. As set forth below and detailed in the School District's and the City's comment letters, these staging areas, which will generate harmful levels of airborne toxins, noise, and vibration, will have a significant adverse impact on the ability of students and the community to use the High School's recreational facilities. Given this harm, the FTA and Metro were obligated to consider feasible and prudent alternatives and least possible harm alternatives to their selected staging areas.

129. The FSEIS provides for the construction of the Project Staging Areas along Century Park East to be located directly adjacent to the school. These staging areas will abut the High School campus and construction activity will take place directly across from its portable classrooms. Staging Area 2 is planned to abut the High School's portable classrooms. The FSEIS emphasizes however, that if the

COMPLAINT

1  Master Plan proceeds according to schedule, the area where the portable classrooms
2  sit will be returned to an athletic field for the period of the most intense, polluting
3  construction at the staging areas. Thus, emissions, noise, and vibrations from the
4  Project Staging Areas will constructively use a community recreational facility—the
5  High School's athletic fields—during construction.

6      130.   Within Staging Area 2, which is directly across from the High School's
7  current portable classrooms and future half soccer field, Metro plans to construct an
8  80-feet wide "temporary access shaft." This shaft will be used to provide access to
9  the tunnel for workers and materials and for removal of excavated material from the
10  tunnel for disposal. Thus, "for approximately two to three years," Staging Area 2
11  will be used for "stockpiling and off-hauling . . . tunnel muck." "[E]xcavating and
12  hoisting equipment" will be required at the site. "A vertical conveyor will raise
13  material from the shaft and a horizontal conveyor will then move the material from
14  the shaft to the stockpile." While the Agencies claim diesel trucks will only be used
15  to haul stockpiled excavated material at night (between 7:30 p.m. and 6:00 a.m.),
16  they acknowledge that tunnel segments "would be delivered to this site during the
17  day shift and would be unloaded and stockpiled with [a] tower crane and lowered
18  into the shaft as needed." Among the equipment that will be used at Staging Area 2
19  are a large dozer, tower crane, boom crane, pile rig drill, front end loader, Bob Cat,
20  drilling polymer plant, concrete pumps, generator, shotcrete machine, ready mix
21  trucks, pick-up trucks, haul trucks, ventilations fans, street sweepers, telehandler,
22  compressor plant, foam plant, conveyor system, segment carrier, and roller
23  compactor.

24      131.   Staging Area 3, across from the High School's current athletic fields,
25  will be used during the duration of construction "for tunnel support equipment,
26  material storage, and contractor offices." Among the equipment that will be used at
27  this site are a boom crane, haul trucks, excavator, concrete pumps, shotcrete
28  machine, lift hoist, and ventilation exhaust scrubbers. The site would also include a

water treatment plant, ventilation plant, grout plant, mechanical shop, and electrical shop.

132.   Since Staging Areas 2 and 3 are not directly adjacent to each other, Metro also proposes to construct a "Materials Transport Corridor" directly adjacent to the school. This corridor, which parallels the High School's fence line, will be used to move materials and equipment between Staging Areas 2 and 3.  Thus, noise, vibration, emissions and particulates from the Materials Transport Corridor will also have a direct and substantial impact on the High School's campus.

133.   Construction activity at the Project Staging Areas is scheduled to take place for "approximately" seven years.  Tunneling activity at the tunnel access shaft is to last for "approximately" two to three years.  The Agencies expect noise and dust effects from the construction to occur for seven years – adversely affecting thousands of the High School's students and impacting community members using the High School recreational facilities for nearly a decade.

134.   Toxic emissions, airborne particulates, noise, and vibration from Staging Areas 2 and 3 and the Materials Transport Corridor onto the High School's recreational facilities constitute a constructive use of the High School's Section 4(f)-protected resources.  During construction at the Project Staging Areas, toxic emissions such as diesel particulate matter ("DPM") and nitrogen dioxide ("$NO_2$") will be released from trucks and equipment, and fine particulate matter ("$PM_{2.5}$" and "$PM_{10}$") and toxic metals will be emitted as a result of drilling, hauling, and construction activities.  Diesel-powered haul trucks will be deployed at night to the staging areas to remove dirt, and they will queue and idle before loading.  Diesel-powered equipment such as bulldozers also will be operated while school is in session and the community is using the High School's recreational facilities.  Fine dust emissions will be generated from excavated material dropped into piles while construction is underway and loaded onto haul trucks in the evening.  Subsurface boring activities may also cause the release of methane and toxic gas into the air.

Indeed, the Agencies themselves acknowledge that at the height of the soil-moving activity, particulate matter ($PM_{10}$) will exceed California ambient air quality standards at the High School's portable classrooms while school is in session.

135.   These airborne toxins will pose substantial health risks for students, faculty, staff, and members of the public using the High School's recreational facilities.   Children, such as high school students, are particularly vulnerable to exposure to toxins.   Toxic emissions and particulates emitted by construction activities at Staging Areas 2 and 3 will be blown directly downwind into the area of the High School's recreational areas, including its lacrosse and baseball fields. These airborne toxins can cause or contribute to severe health problems, ranging from short-term effects such as coughing, dizziness, nausea, and headaches, to long-term effects, such as cancer, chronic asthma, and other respiratory illnesses.

136.   Noise and vibration from Staging Areas 2 and 3 will also adversely impact the High School's recreational facilities, constituting a constructive use of the High School's Section 4(f)-protected resources.   Construction noise and vibration from Staging Area 2 will have significant adverse impact on the ability of students and community members to use the High School recreational facilities, such as the baseball and lacrosse fields.   Given the importance of these Section 4(f) resources to the Beverly Hills community and the harm posed by toxic emissions, noise, and vibration, FTA and Metro were obligated to consider feasible and prudent alternatives. Yet, they failed to do so.

B.   **The FSEIS improperly fails to adequately consider feasible and prudent alternatives to the Project Staging Area and fails to select the staging area that poses the least possible harm.**

137.   Given the harm that they present to the High School and its community, the Agencies' selection of the Project Staging Areas was improper.   Since the Project Staging Areas will "use" the High School's 4(f) resources, the Agencies are prohibited from selecting them unless there are no feasible and prudent alternatives

and they pose the least possible harm of the available alternatives.  The Agencies also must undertake all possible planning to minimize harm to the School District's 4(f) resources.

138.  The Agencies failed to adequately consider the vacant lot at the northeast corner of Constellation Boulevard and Avenue of the Stars, or "Staging Area 1," for construction staging.[2]  Staging Area 1 is feasible and prudent, because it will have no adverse impact on the construction of the tunnel or the future operation of the subway line, and would avoid the harm to the High School and Section 4(f) properties posed by the Project Staging Areas.  The Agencies were under a duty to fairly analyze and consider Staging Area 1, and their failure to do so undermines their selection of the Project Staging Areas.

139.  Given the significant harm posed by construction activities at Staging Areas 2 and 3, the FTA and Metro should have select Staging Area 1.  Staging Areas 2 and 3 are on the fence line of the campus next to recreational play fields, currently occupied by portable classrooms.  By contrast, Staging Area 1 is located 500 feet from the fence line of the High School's campus, greatly reducing risks to student and faculty health, as well as the disruptive noise of a construction site at the boundary of the campus.  By moving the staging areas away from campus, airborne toxic emissions and particulates would diffuse *before* reaching portable classrooms and recreational fields, greatly reducing exposure levels from airborne toxins and particulates for students, faculty, staff, and members of the community using the High School's facilities.  Moreover, Staging Area 1's greater distance from the campus would greatly reduce the impact of noise and vibration from construction activity on the High School's recreational facilities.  Thus, Staging Area 1 is feasible and prudent alternative to the Project Staging Areas, and compared to the Project

---

[2] The merits of Staging Area 1 was brought to the Agencies' attention in the School District's and the City's comment letters.

COMPLAINT

Staging Areas, Staging Area 1 poses the least possible harm to the High School's Section 4(f) assets.

140.   Notably, the Agencies' decision to locate construction staging at the fence line of the High School represents a significant change from the FEIS.  In the FEIS, the Agencies stated their preference to locate construction staging and the Shaft at Staging Area 1, which is much closer to the planned station than the Project Staging Areas -- Staging Areas 2 and 3.  As the Agencies explained in the FEIS, "[u]sually, these construction staging areas and laydown areas are located at station sites to facilitate access to the tunnel."  Now, contrary to this standard practice, the Agencies have chosen to locate construction staging at Staging Areas 2 and 3, which are much farther from the planned station.

141.   The Agencies concluded that the impacts of the change are not significant.  However, they made this determination without having thoroughly analyzed the toxic emissions, noise, and other impacts of Staging Area 1 on the High School.  Had they performed this analysis, they would have concluded that using Staging Area 1 would have far less impact and would inflict far less harm on the High School's Section 4(f) properties than using Staging Areas 2 and 3.

142.   While the Agencies concede the feasibility and prudence of Staging Area 1, they contend that the site "would not be available during the construction period of Section 2" because the developer of 1950 Avenue of the Stars "has recently indicated that the property will be under development in 2018."  They ignore that Metro could obtain a temporary easement to use a portion of that empty lot for construction staging.  Thus, contrary to the FTA and Metro's conclusory representations, nothing prevents Staging Area 1 from being used as the construction staging area for the Century City location.

143.   Given the threat of harm to the High School and its Section 4(f) resources posed by the Project Staging Areas and Materials Transport Corridor, the Agencies' failure to consider and adopt Staging Area 1 as a feasible and prudent

alternative is particularly egregious.  The Agencies improperly weigh the interests of a single real estate developer in the delayed development of a vacant lot as greater than the adverse impacts of the Project Staging Areas on the health of the High School's students, faculty, staff, and community using its Section 4(f) facilities and the education of its students.  By any proper measure, the use of Staging Area 1, which presents none of those threats, poses the least overall harm, and it should have been considered as a feasible and prudent alternative to placing construction staging areas at the High School's borders and selected as the alternative that poses the least possible harm.

144.   Indeed, the Agencies' rejection of Staging Area 1 as a feasible and prudent alternative to Staging Areas 2 and 3 is telling evidence of predetermination. The construction activities at Staging Areas 2 and 3 constructively use the High School's recreational facilities.  Section 4(f) thus requires the Agencies to select a feasible and prudent alternative to these Staging Areas.  Yet, in summarily rejecting Staging Area 1, the FSEIS does not even discuss the factors required by 4(f)'s feasible and prudent alternative analysis.  Rather, it concludes without analysis that the Staging Area 1 site "would not be available during the construction period of Section 2" because the site's developer "has recently indicated that the property will be under development in 2018." The true reason the FSEIS dismisses Staging Area 1 without the required 4(f) analysis is simple: Metro has already acquired the properties required for Staging Areas 2 and 3.

145.   The Agencies' rejection of "Staging Area 4," which is located at the center of Constellation Boulevard near its intersection with Century Park West, for the location of the tunnel access shaft further reflects the insufficiency and cynicism of the Agencies' Section 4(f) and NEPA analyses.  The Agencies prefer to place the tunnel access shaft in Staging Area 2 next to the High School, because placing it in Staging Area 4, which is closer to the station itself, would divert traffic.  In the Agencies' calculus, threats to the health of the High School's students, faculty, staff

COMPLAINT

and community using the High School's Section 4(f) facilities and the education of thousands of its students are less of a concern than the re-routing of traffic. The failure to properly appreciate and weigh the degree of harm posed by construction activities demonstrates that the Agencies failed to adequately consider feasible and prudent alternatives and to take the mandated "hard look." Instead, due to Metro's acquisition of properties in support of their plan to locate the tunnel access shaft in the Project Staging Areas, the Agencies simply reasoned backwards from a predetermined result and rely on pretext rather than proper analyses to reject Staging Area 4.

### C. Toxic Emissions and Particulates from Staging Areas 2 and 3 will pose a significant health risk to the High School's students, faculty, staff, and the community members using its facilities

146. In selecting the Project Staging Areas and the materials transport corridor, the Agencies have insufficiently analyzed and accounted for potential adverse health effects caused by toxic emissions and particulates emitted. The portable classrooms house 500 to 600 students at a time, and all of the High School's students use the portable classrooms at some point during the school day. This construction at the Project Staging Areas – which is scheduled to last for years – will occur while classes are in session and students, faculty, staff, and members of the public using the High School's facilities, including its recreational facilities, are present. Toxic emissions and particulates from the proposed staging areas and transport corridor will be blown directly downwind into the area of the High School's classrooms, administrative buildings, athletic fields, and grounds.

147. Children, such as the High School's students, are more sensitive to toxins than the general adult population and are considered "sensitive receptors." In conducting its health-risk analysis, the FSEIS relies on exposure thresholds that do not adequately protect sensitive groups such as high school children, or any pregnant staff for that matter, from the adverse health effects from toxic emissions of DPM, $PM_{2.5}$, and NOx emissions. The FTA and Metro's use of a 10-in-one million

53

threshold for cancer risk is not appropriate for developing minors such as the High School's young students. To protect children from contracting cancer, a 1-in-one-million threshold for cancer risk is more health-protective and appropriate.

148.   Children are also particularly sensitive to fine particulate $PM_{2.5}$ emissions. To protect children from long-term health impacts from $PM_{2.5}$, a threshold of 1.2 $\mu g/m^3$ for 24-hour average impacts, or 0.3 $\mu g/m^3$ for annual average impacts, is appropriate. These thresholds are consistent with local, state, and federal agency guidelines.

149.   The FSEIS's analysis of air quality impacts from construction at the staging areas also contains numerous errors and flaws that undermine its conclusion that locating the construction staging area at the High School fence line is safe and appropriate. The FSEIS does not appear to follow agency guidance for reviewing health impacts, and its analysis errs in numerous technical assumptions that lead to an underestimation of the Project's adverse health impacts on the High School's students, faculty, staff, and the community that uses the campus. The FSEIS's omissions, errors, and flaws include the following:

- The FSEIS does not present a full analysis of unmitigated health impacts from air emissions at the staging areas, nor present a proper assessment of the availability and efficacy of mitigation measures and alternatives, to adequately address the toxic impacts of the Project Staging Areas;

- The FSEIS's cancer risk exposure threshold, 10-in-one-million, is too high and not health-protective for children. A 1-in-one-million threshold is appropriate and should have been used;

- The FSEIS's analysis of short-term, 24-hour average $PM_{2.5}$ impacts is flawed, because it relies on an exposure threshold too low for sensitive receptors. Given the potential high levels of $PM_{2.5}$ emissions expected to impact the High School campus on a daily basis, to

COMPLAINT

protect sensitive children and others from the short-term health impacts from $PM_{2.5}$ emissions emanating from the proposed staging areas, the federal significance threshold of 1.2 µg/m$^3$ for 24-hour average impacts is appropriate and should have been used;

- The FSEIS fails to analyze the long-term $PM_{2.5}$ health impacts at the High School campus by comparing annual average $PM_{2.5}$ concentrations over several years to the federal significance threshold, 0.3 µg/m$^3$;

- The FSEIS does not account for all the emissions expected from construction activities.  This failure leads the Agencies to underreport the amount of airborne toxins and the negative health impacts of the proposed construction staging areas on the school population;

- In the FSEIS, air quality modeling does not appear to follow local and EPA guidance on developing a proper emission source representation for stationary and mobile off-road and on-road construction equipment.  This flawed approach causes the Agencies to significantly underreport levels of airborne toxins that can be expected from highly concentrated diesel exhaust plumes released from equipment stacks near ground level and from smaller areas of construction activity.  In turn, this leads the Agencies to grossly underestimate the negative health impacts of construction activity from the staging areas adjacent to the High School;

- The Agencies did not perform a conservative and health-protective point-estimate health risk assessment for the impact of construction activity at the staging area on the High School population.  The maximum cancer risk reported at the school should be calculated at the nearest facility property line, consistent with local and state guidance.  Thus, the health risks at the school have not been properly

COMPLAINT

reported for public review and comment; and

- The health risk assessment provided in the SEIS does not quantify the additional public impact from toxic substances in the soil and the potential releases of methane and toxic gases during subsurface activities. These hazards and resulting air emissions will add to the health impacts posed by air emissions from construction equipment used for the project.

150. These failures demonstrate that the Agencies failed to take the mandated "hard look" at the location of the construction staging areas, and improperly dismissed the threat of harm posed by the Project Staging Areas as not significant. When the FSEIS's toxic emissions analysis is corrected, prior to any mitigation, the negative health impacts on the High School campus population and the community that uses the campus are very high. Using the appropriate 1-in-one-million threshold, the cancer risk to the High School students exceeds the threshold by 46 times, the cancer risk in unborn children in their third trimester exceeds the threshold by 18 times, and the cancer risk to adults exceeds the threshold by 11 times.

151. The FSEIS also fails to propose sufficient mitigation measures to reduce the significant health impacts of construction at the Project Staging Areas to acceptable levels. For example, despite the Agencies' proposal to mitigate the adverse air quality impacts of the Project Staging Areas by, among other things, removing a diesel crane and bulldozing from Staging Area 3 and limiting hauling of excavated material by diesel trucks to evening hours, the cancer risk for students would still be unacceptably high at greater than 10 in 1 million. Indeed, even the Agencies' calculation of the risk at 3.6 in 1 million is greater than three times an appropriate level for children.

152. Additionally, while the Agencies' proposal to install MERV-16 filters in the HVAC systems of the High School's portable classrooms will provide some

degree of protection, these filters obviously will do nothing to mitigate the cancer risk to students, faculty, and members of the public using the High School's athletic fields, and the Agencies have not proposed to install these filters in any of the High School's buildings beyond the portable classrooms.

153.   The Agencies also propose to limit the hauling of excavated material from Staging Area 2 by diesel truck to evening hours.  This will reduce levels of harmful levels of DPM during school hours – although those levels will remain unacceptably high.  However, this action also will increase to even higher levels the cancer risk for students and members of the public using the High School's facilities, particularly its athletic fields, during the evening hours.

154.   The FSEIS also provides that contractors will monitor dust and emissions to ensure that that they are kept within acceptable levels.  Therefore, the parties responsible for creating problems will be charged with monitoring and reporting them.  This self-policing system does not create any incentives for contractors to report themselves as violators.  Indeed, the design/build contract puts in place financial penalties for Metro if the Project incurs delays and fails to meet certain deadlines.  Thus, the actual incentives in place favor speed over ensuring environmental safety and a sound educational environment.  Without monitoring by an independent monitor with the power to sanction contractors and shut down work that threatens to harm the High School and its community, the monitoring proposed by the Agencies is meaningless.  Ideally, any independent monitor should be answerable to the School District.

## IV.   NOISE FROM STAGING AREA 2 WILL ADVERSELY IMPACT STUDENTS' EDUCATION

155.   The FSEIS fails to adequately consider the harm that the placement of construction staging areas directly across from the High School's ball fields and temporary classrooms will have on the education of the High School's students. As the Agencies recognize, "[t]he construction of the Project involves activities

which generate high noise and vibration levels." They also acknowledge that while "noise impacts would be reduced through implementation of [the Agencies' recommended] mitigation measures, . . . adverse construction noise impacts could remain after mitigation in areas of concentrated construction activity, including . . . construction laydown areas." As discussed below, noise levels generated by construction activity at the Project Staging Areas will adversely impact the education of the thousands of students using the High School's portable classrooms.

156.   Noise levels at the portable classrooms during construction will far exceed accepted noise levels for schools. The American National Standards Institute ("ANSI") sets forth a noise threshold of 35 dBA for classrooms. This standard is supported by a large body of research that found that when classroom environments have average noise levels greater than 35 dBA, speech is less intelligible to children, and they have lower comprehension.

157.   Moreover, the FTA's own Transit Noise and Vibration Impact Assessment standards considers schools as FTA Category 3 receivers. Category 3 thresholds are 75 VdB for ground borne vibration and 40 A-weighted decibels ("dBA") for ground borne noise. Yet, the Agencies themselves expect that construction noise levels at the High School's portable classrooms will be 65 dBA -- substantially above both the ANSI and FTA Category 3 noise thresholds.

158.   To understate the impact of construction noise on the High School, the Agencies ignore these standards and instead look to the Municipal Code of the City of Beverly Hills. The Agencies rely on a provision of the Municipal Code that provides: "[i]t shall be unlawful for any person to operate any machinery, equipment, pump, fan, air conditioning apparatus, or similar mechanical device in any manner so as to create any noise which would cause the noise level at the property line of any property to exceed the ambient noise level by more than five (5) decibels." Municipal Code, Art. 2, § 5-1-202 ("Machinery, Equipment, Fans,

and Air Conditioning"). The Agencies' noise-impact analysis, thus, is not based on noise standards that are appropriate for schools, but on whether they can keep construction noise levels within 5 dB of pre-construction levels.

159. The Agencies intentionally ignore a provision of the Municipal Code that prohibits the creation of *any* noise near schools while they are in session: "[i]t shall be unlawful for any person to create any noise on any street, sidewalk, or public place adjacent to any school, institution of learning, or church while the same is in use . . . ; which noise substantially and unreasonably interferes with the workings of such institution . . . ." *Id*. § 5-1-206 ("Noise in Proximity of Schools, Hospitals, and Churches"). The Agencies' plans to conduct major construction activities directly adjacent to the High School's temporary classrooms and athletic fields over the course of many years clearly run afoul of the protections for schools contemplated by the Beverly Hills Municipal Code.

160. To establish that construction noise from the Project will come within the strictures of the Beverly Hills Municipal Code, Metro took noise measurements at the High School's lacrosse field before the temporary classrooms were placed there. It found the daytime noise levels at the lacrosse field to be 56 dBA. It then applied a purported "distance adjustment" to that number to come up with noise levels for the High School's "façade" and its temporary classroom buildings. Metro calculated the pre-construction daytime noise level at the school's façade to be 53 dBA and at the temporary classrooms to be 59 dBA. Metro then used modelling to predict the impact of construction noise. The Agencies calculate the daytime noise levels at the High School caused by construction as follows: the lacrosse field - 58 dB; the High School's façade – 56 dB; and the temporary classroom buildings closest to the Staging Area 2 - 69 dB. Each of these numbers substantially exceeds both the ANSI and FTA Category 3 thresholds, with the noise levels at the temporary classrooms nearly double the ANSI standard.

161. The Agencies' projected construction noise levels also exceed the

COMPLAINT

1   Beverly Hills Municipal Code standard that they disingenuously rely on to

2   understate the harm that construction noise will have on the High School.  As the

3   Agencies admit, "the construction noise level at . . . BHHS temporary classroom

4   buildings closest to the Area 2 construction site[] is predicted to exceed the noise

5   limit by 8 dB for daytime and 7 dB for nighttime hours."  These high noise levels

6   will have a deleterious effect on education.

7        162.   The High School's portable classrooms, which will directly abut

8   Staging Area 2, have less sound attenuation properties than permanently

9   constructed buildings.  Thus, construction noise and vibration from the staging area

10   will have a substantial adverse impact on the comprehension and performance of

11   students attending classes in those classrooms.  Under the current construction

12   schedule, the negative effects of noise and vibration will last the entire high school

13   career of a current freshman, posing a threat to these students' education as a

14   whole.

15        163.   The FSEIS provides that contractors will bear much of the

16   responsibility to undertake measures to reduce noise and vibration and to monitor

17   them to ensure that that they are kept within acceptable levels.  Therefore, as with

18   airborne toxins, the parties responsible for creating problems will be charged with

19   monitoring and mitigating them.

20        164.   The Agencies propose two types of noise monitoring.  Continuous

21   noise monitoring "to be performed in areas where nighttime work is anticipated"

22   and "short-term noise monitoring, which consists of weekly short duration (1 hour

23   or more) measurements to verify that noise levels during construction do not

24   exceed the predicted noise levels or relevant impact criteria."  Thus, the High

25   School – including its vulnerable temporary classrooms – will only receive

26   "weekly short duration" monitoring.  Harm to the learning environment can arise

27   anytime high levels of construction noise are present during school hours.  The

28   Agencies' proposed intermittent, short-term monitoring appears designed more to

miss harmful noise events rather than to detect them, and this deficiency further reflects the Agencies' indifference to the educational environment of the High School.

165.   Moreover, despite the substantial construction activity to be undertaken at Staging Area 2, the Agencies have no plan to continuously monitor harmful vibrations at the temporary classrooms during school hours.  Metro plans to stock pile excavated material – or "muck" – at this staging area, which directly abuts the temporary classrooms.  According to the Agencies, muck piling "is predicted to generate the highest noise levels" at the portable classrooms.   They also state that a front-end loader used for muck piling and handling at the site will "generate the highest ground vibration levels at any of the sites during tunneling." They note that a "vibratory roller and dozer" also will be used at the site.  Yet, the Agencies make no effort to analyze the effect of vibrations from this nearby construction activity on the educational environment of the temporary classrooms.

166.   As set forth above, the design/build contract establishes financial penalties for Metro if the Project incurs delays and fails to meet deadlines.  The incentives currently in place favor speed over ensuring a sound educational environment.  At the very minimum, an independent monitor for noise and vibration is required.  Without monitoring of noise and vibration by an independent monitor with the power to sanction contractors and shut down work that threatens to harm students' education, the monitoring proposed by the Agencies is meaningless.

167.   Noise and vibration levels predicted in the FSEIS for planned Building C are also harmful to learning and necessarily limit the recreational and educational uses of that building.  The FSEIS states that the noise and vibration effects for operation of a single train under Building C to be 53 dBA (first story) and 72 VdBs within the subterranean parking structure.  Those numbers increase to 56 dBA and 75 VdBs when two trains pass beneath the structure, and the SEIS

COMPLAINT

1    estimates that two trains will simultaneously pass under Building C up to 21 times

2    per day.

3    168.    The Agencies also fail to plan for the implementation of appropriate

4    mitigation measures.  Given the importance of education, schools should be

5    classified as FTA Category 1 receivers – the lowest noise threshold.  Indeed, Metro

6    agreed to apply an FTA Category 1 standard and to undertake appropriate

7    mitigation measures to the Colburn School of Music with respect to the subway

8    section that will run between Walt Disney Concert Hall and the Colburn School.

9    There, the subway line will run 135 feet below street level.  In contrast, here, the

10   High School's Building C will, at points, be within 24.5 feet of the rails.  Yet, the

11   Agencies have offered no mitigation measures to reduce the noise from subway

12   trains running beneath the High School to FTA Category 1 thresholds.

13   169.    Additionally, the Agencies fail to propose any classroom-based noise

14   mitigation measures.  Noise reduction systems are often used in classrooms to

15   enhance learning environments.  The installation of such systems would help

16   mitigate any possible dBA increases from the already high levels tested in the High

17   School's portable classrooms.

18   170.    Ensuring appropriate noise levels and listening conditions at a school

19   is essential to maintaining the ability of teachers to deliver instruction in the

20   classroom effectively.  Students must be able to clearly and easily hear and

21   understand what is being said.  Children under age 15 are more sensitive to

22   difficult listening conditions because they are still developing mature language

23   skills and, compared with adults, children have more difficulty with complex

24   listening tasks.  Noise interference in the classroom can impair children's speech

25   and listening comprehension as well as their concentration, understanding of verbal

26   information, reading comprehension, and memory.  In noisy conditions, children

27   require a greater "signal-to-noise" ratio or less distortion from background noise to

28   perform on par with adults in speech recognition tasks.  Chronic exposures to

internal and external sources of noise can lead to deficits in test scores.

171.   Given the significant harm to the High School's learning environment posed by noise and vibration from construction activities at Staging Area 2, Staging Area 1 is a prudent and feasible alternative the FTA and Metro should have considered, properly evaluated, and selected as the alternative posing the least harm.  Its location approximately 500 feet farther from the fence line of the High School campus than Staging Area 2, will greatly reduce the impact of noise from construction activity on the High School classrooms.  Additionally, a change of the subway tunnel alignment from the Project Alignment to one of the Proposed Alternative Alignments will eliminate the negative impact of noise and vibration on Building C.

## V.    ABANDONED OIL WELLS AND METHANE ON THE HIGH SCHOOL CAMPUS POSE SIGNIFICANT RISKS TO THE HIGH SCHOOL'S STUDENTS, FACULTY, STAFF, AND THE COMMUNITY MEMBERS USING ITS FACILITIES

172.   The Agencies have severely underestimated the possible existence of abandoned oil wells on the High School campus, the likelihood that these wells have accumulations of methane inside of their casings, and the likelihood that such wells will be punctured by the tunnel boring machine.  As a result, the FSEIS understates the risk of harm to the students, faculty, and public who use the High School campus from a release of methane in the event that a well containing trapped gas is punctured, including the risk that such gas will accumulate under a building or result in a sudden uncontrolled release of gas, leading to exposure to students and staff, as well as the risk of a potential explosion.  This would force the High School to close in order to address the emergency and to re-abandon the well.

173.   Additionally, the School District's Proposed Alternative Alignments, each of which runs under open and undeveloped fields and buildings that are already slated to be demolished as part of the High School's Master Plan, mitigate

COMPLAINT

risks should construction encounter an abandoned oil well. As the Agencies acknowledge, "[l]ocating and removal of abandoned oil wells is most efficient from the surface." If the top of the well is obstructed by a building, however, removal of the well becomes more complicated and dangerous, as the well must be accessed and removed from underground at tunnel depth, increasing the likelihood that combustible gas will be released.

174. Further, to date, FTA and Metro have collected insufficient information regarding the amount and location of naturally occurring methane on the High School campus. California Department of Toxic Substances has declared the High School campus to be a "methane zone." Yet, FTA and Metro have only taken soil gas samples from a single borehole at tunnel depth on the campus and that single borehole demonstrated that methane concentrations increased as depth increased. The FSEIS also mischaracterizes the nature of the ground under the High School campus and the ability of methane to travel vertically through it. The Agencies' analysis also fails to consider and address the manner in which the tunneling process will create new pathways for methane to travel upwards to the surface. As a result, they understate the risk of harm that such methane migration poses to the students, faculty, and public who use the High School campus. They also have not proposed an adequate methane migration system for the campus, which would reduce the risk of such methane migration introduced by tunneling under the surface.

## VI. THE FSEIS'S SEISMIC ANALYSES ARE STILTED TOWARD A PREDETERMINED SELECTION OF THE PROJECT ALIGNMENT AND CONSTELLATION BOULEVARD STATION OVER THE <u>SANTA MONICA BOULEVARD ALIGNMENT AND STATION</u>

175. Although the FSEIS purports to update the seismic analysis from the March 2012 FEIS to account for new studies, the evaluation remains flawed and geared toward avoiding facts and analyses that support the conclusion that there is

COMPLAINT

no fault present on Santa Monica Boulevard. The FSEIS's seismic analysis is inconsistent in its explanations of how geologic evidence was gathered and analyzed, with a bias towards not disturbing the predetermined conclusion that the Century City station should be sited on Constellation Boulevard. The FSEIS also reflects a reliance on flawed data, which, if corrected, would undermine the conclusions that the FTA and Metro have reached regarding the existence of active faults in the Century City area. Had the FTA and Metro conducted a proper analysis, they would have determined that the Santa Monica alignment is feasible and prudent and would avoid harm to the High School campus.

176. The FSEIS fails to take a hard look at new fault information since the 2011 release of the FEIS. These investigations, undertaken by multiple experts, have consistently failed to find any active faults along Santa Monica Boulevard. Despite the wealth of seismic studies that was submitted to the Agencies, the FSEIS still wrongly concludes that there are active faults preventing the location of a station on Santa Monica Boulevard. Instead of acknowledging that the numerous additional studies conducted since the FEIS directly refutes the findings reflected in the FEIS, the Agencies claim that these studies only supplement the geology in the FEIS.

177. The FSEIS also fails to evaluate geologic evidence consistently. As an initial matter, no fault investigations similar in detail to those performed for a potential Santa Monica Boulevard station were performed for the Constellation or the Rodeo/Wilshire stations, nor for any other stations on the Purple Line. Only the Santa Monica station was targeted for a detailed fault investigation. Additionally, the Agencies have selectively defined an active fault for Section 2 as one having ruptured in the last 35,000 years, even though the Agencies—for every other project—have previously defined an active fault based on an 11,700 year benchmark established by state law and the California Geological Survey. Further, in the face of exact same or similar geologic conditions at different locations, the

COMPLAINT

Agencies interpret the conditions differently.  For example, the Agencies interpret thickening of older alluvial deposits under the High School and at the proposed Santa Monica station as indicative of active faulting, but are silent to the same characteristics under the Wilshire/Rodeo station.  Likewise, the Agencies selectively interpret a series of faults through the High School campus to explain vertical differences in equivalent sedimentary layers dipping gently to the east.  But at the Constellation station, the Agencies conclude there is no evidence of faulting despite a tilt similar to that located under the High School.

178.  The FSEIS also rely on flawed data.  For example, Metro relies on low-resolution photos of a 1972 excavation near the Constellation station to conclude that there is direct evidence that these excavations found no evidence of faulting in the greater Constellation area.  However, the geology depicted in these photos are of poor quality, distant from the geology at issue, and frequently obscured by other objects.  Moreover, no geological inspection of the excavation walls appears to have been completed when they were excavating, particularly not one focusing on the issue of faults.  As such, these photos cannot support the conclusion that Metro draws from them and no serious seismic professional would accept these photos as reliable data.

## STATUTORY AND REGULATORY BACKGROUND

### A.    National Environmental Policy Act ("NEPA")

179.  NEPA requires federal agencies undertaking any major federal action to review the environmental impacts of the proposed action and to "study, develop, and describe appropriate alternatives to recommended courses of action."  42 U.S.C. § 4332(2)(C), (E).  NEPA's purpose is two-fold: first, to ensure that federal agencies undertaking a major federal action take a hard look at the proposed project's environmental impacts before deciding how to proceed and, second, to ensure that relevant information about the impacts of a proposed project and its alternatives is made available to members of the public in order to provide the public with a

COMPLAINT

meaningful opportunity for comment and participation in the federal decision-making process.

180.    The Council on Environmental Quality ("CEQ") has promulgated regulations applicable to all federal agencies undertaking a NEPA review. 40 C.F.R. Part 1500.   Individual agencies supplement the CEQ regulations with agency-specific regulations; NEPA regulations applicable to FTA and Federal Highway Administration ("FHWA") actions are set forth at 23 C.F.R. Part 771.

181.    The CEQ regulations direct federal agencies to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse impacts of these options upon the quality of the human environment."   40 C.F.R. § 1500.2(e).   The regulations stress that the alternatives analysis of an EIS "is the heart of the environmental impact statement," and therefore require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14.

182.    Essential to an agency's obligations under NEPA is the duty to insure that "high quality" environmental information is available to the public before decisions are made and before actions are taken. *Id*. at § 1500.1(b). Agencies are to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." *Id*. at § 1506.6(a).   Further, agencies are to hold or sponsor public hearings or meetings whenever appropriate, including when there is "[s]ubstantial environmental controversy concerning the proposed action or substantial interest in holding the hearing." *Id*. at § 1506.6(c)(1).

183.    The CEQ NEPA regulations provide for coordination between federal agencies subject to NEPA and state and local agencies "to reduce duplication between NEPA and State and local requirements." *Id*. at § 1506.2(a); 23 U.S.C. § 139(f)(4)(E). State and local agencies such as Metro may act as joint lead agencies, together with at least one federal agency, to prepare an EIS. 40 C.F.R. § 1501.5(a), (b); 23 U.S.C. § 139(c)(3). As a joint lead agencies, both FTA and Metro have the

responsibility "to prepare or ensure that any required environmental impact statement or other document required to be completed under [NEPA] is completed in accordance with [Section 139] and applicable Federal law."  23 U.S.C. § 139(c)(6).   The FTA, as federal lead agency, bears the responsibility of "independently evaluating such document" before approving it.  23 U.S.C. § 139(c)(3).   Indeed, both the CEQ and FHWA-FTA regulations require federal agencies to "independently evaluate" information considered in the environmental review and "take responsibility for its accuracy."  40 C.F.R. at § 1506.5; 23 C.F.R. § 771.109(c)(2) (state or local government entities that serve as joint lead agencies with the FTA "may prepare environmental review documents" if the FTA "furnishes guidance and independently evaluates the documents") and (c)(5) (state or local agency "may prepare the EIS and other environmental review documents with the [FTA] furnishing guidance, participating in the preparation, and independently evaluating the document").

184.   The CEQ NEPA regulations emphasize that "[a]ccurate scientific analysis … and public scrutiny are essential to implementing NEPA."  40 C.F.R. at § 1500.1(6).  NEPA directs agencies to, *inter alia*, "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  *Id.* at § 1500.2(d).  "Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, *rather than justifying decisions already made*."  *Id.* at § 1502.2(g) (emphasis added).  Thus, the environmental impact statement "shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made."  *Id.* at § 1502.5.  Moreover, "[a]gencies shall not commit resources prejudicing selection of alternatives before making a final decision."  *Id.* at § 1502.2.

185.   To ensure meaningful analysis, the regulations impose "[l]imitations on actions during the NEPA process."  *Id.* at § 1506.1.  "Until an agency issues a record

of decision as provided in § 1505.2 . . . , no action concerning the proposal shall be taken which would: (1) [h]ave an adverse environmental impact; or (2) [l]imit the choice of reasonable alternatives." *Id.* at § 1506(a).  Moreover, the CEQ regulations place an affirmative responsibility on a federal agency to prevent such action:  "[I]f any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would" either have an adverse environmental impact or limit the choice of reasonable alternatives, "the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved." *Id.* at § 1506.1(b).

186.   An agency preparing an EIS must discuss in detail the environmental impacts of the proposed action and its alternatives, including issues related to "urban quality, historic and cultural resources, and the design of the built environment." *Id.* at § 1502.16(g).  A ROD must "[i]dentify all alternatives considered by the agency" and "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted." *Id.* at § 1505.2.

187.   The FTA-FHWA joint regulations supplementing the CEQ regulations provide that the agencies should evaluate alternatives and make decisions "in the best overall public interest based upon a balanced consideration of the need for safe and efficient transportation; of the social, economic, and environmental impacts of the proposed transportation improvement; and of national, State, and local environmental protection goals." 23 C.F.R. § 771.105(b).   The Final EIS must "be reviewed for legal sufficiency prior to Administration approval." *Id.* at § 771.125(b).

188.   Like the CEQ regulations, the FTA-FHWA joint regulations impose restrictions on "administration activities" prior to the issuance of a record of decision. *Id.* at § 771.113.  "[F]inal design activities, property acquisition, purchase of construction materials or rolling stock, or project construction shall not proceed until . . . [a] final EIS has been approved and available for the prescribed period of

COMPLAINT

time and a record of decision has been signed." *Id.* Acquisition means "activities to obtain an interest in, and possession of, real property." *Id.* at § 710.105. "The process of acquiring real property includes appraisal, appraisal review, waiver valuations, establishing estimates of just compensation, negotiations, relocation assistance, administrative and legal settlements, and court settlements and condemnations." *Id.* at § 710.305.

189.   Pursuant to Section 771.113 of the NEPA regulations, the FTA website states that, "an FTA grant applicant may not acquire (by any means, including through donation) real property or real property rights for a transit project until the NEPA process has been completed with a ROD . . . by FTA. The reason for this prohibition is that the acquisition of property would prejudice the consideration of alternatives. Even if the property in question is needed for all of the 'build' alternatives under consideration, the CEQ regulations require that the No Action (or No Build) alternative be given fair consideration. Property acquisition would bias consideration of the No Action alternative."

190.   Moreover, "Letters of Intent . . . to indicate an intention to obligate future funds . . . will not be issued by FTA until the NEPA process is completed." *Id.* at § 771.113(c); *see also FTA Full Funding Grant Agreement Guidance*, C 5200.1A, at 9 ("[T]he appropriations subcommittee directed FTA to enter into an FFGA for any given project only when there are no outstanding issues that would have a material effect on the estimated costs of the project . . . . The subcommittees also direct that FTA not award an FFGA unless the project had entered final design.").

191.   Where supplemental analyses are required, NEPA regulations are clear that the administrative process for completing a SEIS must follow "the same process and format (*i.e.*, draft EIS, final EIS, and ROD) as an original EIS." 23 C.F.R. § 771.130(d); *see also* FTA Standard Operating Procedure ("SOR") No. 17, Re-Evaluations and Supplemental Documents, at § 5.6 ("FTA's practice is to prepare

amended decision documents that incorporate the supplemental analysis and record all of FTA's determinations for the project in one location."). Additionally, NEPA regulations provide that if the changes to an environmental impact statement "are of such magnitude to require a reassessment of the entire action, or more than a limited portion of the overall action, the Administration shall suspend any activities which would have an adverse environmental impact or limit the choice of reasonable alternatives, until the supplemental EIS is completed." 23 C.F.R. § 771.130(f)(3).

192.   CEQ regulations require that agencies "make every effort to disclose and discuss at appropriate points in the draft environmental impact statement all major points of view on the environmental impacts of the alternatives including the proposed action." 40 C.F.R. § 1502.9(a).   Agencies are required to discuss at appropriate points in the FEIS any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised. *Id.* at § 1502.9(b).

193.   Agencies must supplement a draft or final EIS if "(1) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (2) [t]here are significant[3] new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* at § 1502.9(c)(1); 23 C.F.R. § 771.130(a).   Agencies may supplement an EIS when "the agency determines that the purposes of [NEPA] will be furthered by doing so."

---

[3]     The term "significantly," as used in the NEPA context, "requires considerations of both context and intensity." 40 C.F.R. § 1508.27.   In terms of "context," this means that an agency must consider significance to, *inter alia*, the affected region, the affected interests, and the locality, including both short- and long-term effects. *Id.* at § 1508.27(a). The consideration of "intensity" turns on an evaluation of ten factors, including, *inter alia*, the degree to which the proposed action affects public health or safety; unique characteristics of the area such as proximity to historic or cultural resources and park lands; the degree to which the effects on the human environment are likely to be "highly controversial"; the degree to which environmental effects are "highly uncertain or involve unique or unknown risks;" and the degree to which the action may adversely impact or cause loss or destruction of significant cultural or historical resources. *Id.* at § 1508.27(b).

COMPLAINT

40 C.F.R. § 1502.9(c)(2).  The FHWA-FTA NEPA guidelines further provide that a supplemental DEIS "may be necessary for major new fixed guideway capital projects proposed for FTA funding [such as the Westside Subway Extension Project] if there is a substantial change in the level of detail on project impacts during project planning and development." 23 C.F.R. § 771.130(e).  The regulations provide that, in such cases, the supplement shall address "site-specific impacts and refined cost estimates that have been developed since the original [DEIS]."  *Id.*

194.   Under the CEQ NEPA regulations, "[w]hen an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking."  40 C.F.R. § 1502.22.  Further, if the incomplete information "is essential to a reasoned choice among alternatives" and the costs to obtain complete information are "not exorbitant," the agency *must* include complete information in the EIS.  *Id.* at § 1502.22(a).

**B.    Federal Funding Programs**

195.   The Project receives federal funding from three sources: (1) the New Starts Program, (2) the Congestion Mitigation and Air Quality Program, and (3) the Transportation Infrastructure Finance and Innovation Act.  Each of these federal assistance programs requires compliance with NEPA and its implementing regulations, including 49 C.F.R. §§ 1500-1508 and 23 C.F.R. § 771.  Thus, the limitations on administration activities set forth in 49 C.F.R. § 1506.1 and 23 C.F.R. § 771 apply to each of these programs.  The lead agencies are prohibited from using federal funds to engage in "final design activities, property acquisition, purchase or construction materials or rolling stock, or project construction" until a ROD has been signed.  *Id.* at § 771.113(a).  The reason for these prohibitions is that the acquisition of property would prejudice the consideration of alternatives.  40 C.F.R. § 1506.1.

COMPLAINT

### 1.    <u>The New Starts Program</u>

196.    The New Starts program, codified at 49 U.S.C. § 5309, provides a mechanism for federal funding of fixed guideway investments such as the Westside Subway Extension Project.  New Start projects are new fixed guideway projects or extensions to existing fixed guideway systems with a total estimated capital cost of $300 million or more.  Fixed guideway capital projects have two stages: a project development phase and an engineering phase.  *Id.* at § 5309(d).  During the project development phase, the applicant develops sufficient information to enable the FTA to make findings of project justification and local commitment of funds.  *Id.* at § 5309(d)(1).  The project development phase is concurrent with the NEPA analysis.  *Id.*  A project enters the engineering phase "upon completion of activities required under [NEPA], as demonstrated by a record of decision with respect to the project."  *Id.* at § 5309(d)(2).  After the engineering phase and ROD are complete, the FTA issues a letter of intent to obligate federal funds to the project.  *Id.* at § 5309(k).  The FTA may then enter into a full funding grant agreement ("FFGA"), under which it may disburse federal funds for the project.  *Id.*

197.    The timing of the FFGA is governed by the FTA-FHWA joint NEPA regulations, which provide that "Letters of Intent issued under the authority of 49 U.S.C. § 5309(g) . . . to indicate an intention to obligate future funds . . . will not be issued by FTA until the NEPA process is completed."  23 C.F.R. § 771.113(c); *FTA Full Funding Grant Agreement Guidance*, C 5200.1A, at 9 ("[T]he appropriations subcommittee directed FTA to enter into an FFGA for any given project only when there are no outstanding issues that would have a material effect on the estimated costs of the project . . . .  The subcommittees also direct that FTA not award an FFGA unless the project had entered final design.").  The lead agencies are also prohibited from using federal funds to engage in "final design activities, property acquisition, purchase of construction materials or rolling stock, or project construction" until a ROD has been signed.  23 C.F.R. § 771.113(a).  "Before FTA may award an FFGA

or any other type of grant under the Section 5309 capital program, FTA must find that no adverse environmental effect is likely to result from the project, or no feasible and prudent alternative to the effect exists and all reasonable steps have been taken to minimize the effect." *FTA Full Funding Grant Agreement Guidance*, at Chapter II.4. The reason for these prohibitions is that the acquisition of property would prejudice the consideration of alternatives. 40 C.F.R. § 1506.1.

### 2.  Congestion Mitigation and Air Quality Improvement Program and Urbanized Area Formula Program

198. The Congestion Management and Air Quality ("CMAQ") Program, codified as 23 U.S.C. § 149, provides a mechanism to provide flexible funding to state and local governments for transportation projects and programs in order to meet the Clean Air Act. Recipients of CMAQ funds are permitted to transfer funds to the FTA for public transportation projects that are eligible for the Urbanized Area Formula Program. Under the Urbanized Area Formula Program ("UAFP"), codified at 49 U.S.C. § 5307, the FTA administers these funds in a separate Section 5307 grant. The FTA Circular for the UAFP states that "[a]ll projects seeking FTA financial assistance require compliance with the [NEPA] implementing regulations (40 C.F.R. part 1500-1508), FHWA and FTA's Environmental Impact and Related Procedures (23 C.F.R. part 771), Efficient Environmental Reviews for Project Decisionmaking (23 U.S.C. part 139), and numerous other environmental laws . . . ." *Urbanized Area Formula Program: Program Guidance and Application Instructions, FTA C 9030.1E*, at VII-9, ¶ 11. "Project sponsors should not move forward with any steps to develop the project that would preclude the fair consideration of alternatives (e.g., final design and construction) until FTA concludes the NEPA process by issuing a [ROD]." *Id.*

COMPLAINT

### 3.    Transportation Infrastructure Finance and Innovation Act

199.    The Transportation Infrastructure Finance and Innovation Act ("TIFIA"), Pub. L. 105-178, 112 Stat. 107, 241 (1998), codified at 23 U.S.C. §§ 601-609, provides a mechanism for federal funding of nationally or regionally significant surface transportation projects, such as the Westside Subway Extension Project. TIFIA requires that, in determining eligibility of applicant projects, the FTA consider, *inter alia*, "[t]he extent to which the project helps maintain or protect the environment."    49 C.F.R. § 80.15(a)(7) (as one of eight relevant criteria, environmental impacts are to be weighed as one-fifth of the evaluation and selection process).    Funds loaned under the TIFIA program must comply with NEPA.    23 U.S.C. § 602(c); 49 C.F.R. § 80.9(c).    The FTA is prohibited from obligating funds for a project that has not received an environmental Categorical Exclusion, a Finding of No Significant Impact, or a Record of Decision as a result of the NEPA process. 23 U.S.C. § 602(c)(2).

### C.    Department of Transportation Act of 1966, Section 4(f)

200.    Section 4(f) of the Department of Transportation ("DOT") Act of 1966, codified at 49 U.S.C. § 303 and 23 U.S.C. § 138, allows the Secretary of Transportation to "approve a transportation program or project … requiring the use of publicly owned land of a public park, recreation area … of national, State, or local significance, or land of an historic site of national, State, or local significance … *only if* (1) there is no prudent and feasible alternative to using that land; *and* (2) the program or project includes all possible planning to minimize harm to the park, recreation area, …  or historic site resulting from the use."  49 U.S.C. § 303(c) (emphasis added).  Further, the FTA "shall review all Section 4(f) approvals . . . for legal sufficiency."  23 C.F.R. § 774.7(d).

201.    "The potential use of land from a Section 4(f) property shall be evaluated as early as practicable."  *Id.* at § 774.9(a).  The Section 4(f) approval is made in the final EIS and ROD.  *Id.* at § 774.9(b).  "After the . . . ROD has been

processed, a separate Section 4(f) approval will be required . . . if [the FTA] determines that Section 4(f) applies to the use of a property." *Id.* at § 774.9(c). Section 4(f) regulations limit activities in furtherance of a project that may be affected by the additional Section 4(f) analysis: "Where a separate Section 4(f) approval is required, any activity *not directly affected* by the Section 4(f) approval can proceed during the analysis, consistent with § 771.130(f) of this chapter." *Id.* (emphasis added); *see also* FHWA Policy at 58 (same). Moreover, "[i]f a new or supplemental NEPA document is also required under § 771.130 of this chapter, then it should include the documentation supporting the separate Section 4(f) approval." 23 C.F.R. at 774.9(d). If changes to an environmental impact statement "are of such magnitude to require a reassessment of the entire action, or more than a limited portion of the overall action, the Administration shall suspend any activities which would have an adverse environmental impact or limit the choice of reasonable alternatives, until the supplemental EIS is completed." *Id.* at § 771.130(f). "Before the FTA may award an FFGA or any other type of grant under the Section 5309 capital program, FTA must find that "no adverse environmental effect is likely to result from the project, or no feasible and prudent alternative to the effect exists and all reasonable steps have been taken to minimize the effect." *FTA Full Funding Grant Agreement Guidance*, C 5200.1A, at Chapter II.4. "The steps for environmental review of an FTA-funded project are set forth in . . . 23 C.F.R. Part 771." *Id.*

202.   The FTA and FHWA regulations implementing Section 4(f) specify that a "use" occurs "(1) [w]hen land is permanently incorporated into a transportation facility; (2) [w]hen there is a temporary occupancy of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in [40 C.F.R.] § 774.13(d); or (3) [w]hen there is a constructive use of a Section 4(f) property as determined by the criteria in [23 C.F.R.] § 774.15." 23 C.F.R. § 774.17.

COMPLAINT

203.   A temporary occupancy of a Section 4(f) property constitutes a use unless *all* of the following criteria are satisfied: "(1) [d]uration must be temporary, *i.e.*, less than the time needed for construction of the project…; (2) [s]cope of the work must be minor, *i.e.*, both the nature and the magnitude of the changes to the Section 4(f) property are minimal; (3) [t]here are no anticipated permanent adverse physical impacts, nor will there be interference with the protected activities, feature, or attributes of the property, on either a temporary or permanent basis; [and] (4) [t]he land being used must be fully restored, *i.e.*, the property must be returned to a condition which is at least as good as that which existed prior to the project … ." *Id.* at § 774.13(d).

204.   A "constructive use" occurs when a transportation project does not incorporate land from a Section 4(f) property but nonetheless has such a severe impact on the property, due to the project's proximity, "that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired." *Id.* at § 774.15(a). "Substantial impairment" occurs when "the protected activities, features, or attributes of the property are substantially diminished." *Id.* The FHWA's Section 4(f) policy explains that, in the context of tunneling projects, "substantial diminishment" occurs when "the value of the resource in terms of its Section 4(f) significance will be meaningfully reduced or lost. The degree of impact and impairment should be determined in consultation with the officials having jurisdiction over the resource." FHWA Section 4(f) Policy Paper (2012) ("FHWA Policy") at 33. The FHWA Policy further provides that, in the case of tunneling, Section 4(f) applies where, *inter alia*, the tunneling "[s]ubstantially impairs the value of [a] historic site," or where tunneling "would permanently harm the purposes for which the park [or] recreation [area] … was established." *Id.* at 59.

205.   Additionally, with respect to Section 4(f)'s applicability to historic districts, the FHWA Section 4(f) policy explains: "FHWA's long-standing policy is

that Section 4(f) applies to those properties that are considered contributing to the eligibility of the historic district, as well as any individually eligible property within the distrct." *Id.* at 28.  However, "[w]hen a project requires land from a *non-historic or non-contributing property* lying within a historic district and does not use other land within the historic district that is considered contributing to its historic significance, FHWA's longstanding policy is that *there is no direct use of the historic district for purposes of Section 4(f)*." *Id.* at 35 (emphasis added).

206.   FHWA-FTA regulations require determinations regarding constructive use  to be based upon the following: (1) identification of the current activities, features, or attributes of the property which render it a Section 4(f) property and which may be impacted due to proximity of the project; (2) an analysis of the net (*i.e.*, taking into consideration mitigation) proximity impacts of the project on the Section 4(f) property; and (3) consultation regarding the foregoing factors with the official(s) having jurisdiction over the Section 4(f) property.  23 C.F.R. § 774.15(d). Constructive uses occur in certain situations including, *inter alia*, where the project "results in a restriction of access which substantially diminishes the utility of a [Section 4(f) property]" or where "[t]he vibration impact from construction or operation of the project substantially impairs the use of a Section 4(f) property . . . ." *Id.* at § 774.15(e)(3)-(4).

207.   The FTA may not approve the use of a Section 4(f) property unless either (1) "the use of the property . . . will have a *de minimis* impact . . . on the property"; or (2) no "feasible and prudent alternative" exists *and* "all possible planning" has been included to minimize harm to the 4(f) property resulting from such use. *Id.* at § 774.3.

208.   A "*de minimis* impact" means that, for historic sites, "no historic property is affected by the project or that the project will have 'no adverse effect' on the property in question"; for parks and recreation areas, a *de minimis* impact is one

COMPLAINT

that "will not adversely affect the features, attributes, or activities qualifying the property for protection under Section 4(f)." *Id.*

209. A "feasible and prudent alternative" is one that "avoids using Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property." *Id.* at § 774.17. An alternative is not "feasible" if it cannot be built as a matter of sound engineering judgment. *Id.* An alternative is not "prudent" if: "(i) [i]t compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need; (ii) [i]t results in unacceptable safety or operational problems; (iii) [a]fter reasonable mitigation, it still causes: (A) [s]evere social, economic, or environmental impacts; (B) [s]evere disruption to established communities; (C) [s]evere disproportionate impacts to minority or low income populations; or (D) [s]evere impacts to environmental resources protected under other Federal statutes; (iv) [i]t results in additional construction, maintenance, or operational costs of an extraordinary magnitude; (v) [i]t causes other unique problems or unusual factors; or (vi) [i]t involves multiple factors in paragraphs (3)(i) through 3(v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude." *Id.*

210. If the FTA determines that there is no feasible and prudent alternative, the FTA may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that causes the "least overall harm" in light of the statute's preservation purpose. The "least overall harm" is determined by balancing: "(i) [t]he ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property); (ii) [t]he relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection; (iii) [t]he relative significance of each Section 4(f) property; (iv) [t]he views of the official(s) with jurisdiction over each Section 4(f) property; (v) [t]he degree to which each alternative meets the

purpose and need for the project; (vi) [a]fter reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and (vii) [s]substantial differences in costs among the alternatives." *Id.* § 774.3. "When comparing the alternatives under these factors, FHWA policy is to develop comparable mitigation measures where possible. In other words, the comparison may not be skewed by over-mitigating one alternative while under-mitigating another alternative for which comparable mitigation could be incorporated." FHWA Policy at 15.

211. Additionally, the FTA must include "all possible planning" to minimize harm to Section 4(f) property before approving the use of such property. *Id.* "All possible planning" means that "all reasonable measures identified in the Section 4(f) evaluation to minimize harm or mitigate for adverse impacts and effects must be included in the project." *Id.* at § 774.17. For public parks and recreation areas, the measures may include, but are not limited to, design modifications or design goals, replacement of land or facilities of comparable value and function; or monetary compensation to enhance the remaining property or to mitigate the adverse impacts of the project in other ways. *Id.* For historic sites, measures should preserve the historic activities, features, or attributes of the site. *Id.* "Minimization and mitigation measures should be determined through consultation with the official(s) with jurisdiction." FHWA Policy at 19.

212. FHWA policy makes plain that determinations regarding applicability of Section 4(f) should consider planned uses for properties. The FHWA Policy provides that Section 4(f) applies in situations where a "planned facility is presently publicly owned, formally designated, and significant." FHWA Policy at 58. While a mere expression of interest in pursuing plans does not rise to the level of "formal designation," the inclusion of the publicly-owned land and its function as a Section 4(f) resource "into a city or county Master Plan" triggers application of Section 4(f). *Id*. at 57.

COMPLAINT

### D. National Historic Preservation Act, Section 106

213.    Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f, requires Federal agencies to take into account the effects of their undertakings on historic properties and provide the Advisory Council on Historic Preservation  a reasonable opportunity to comment on such undertakings.

### E. Administrative Procedure Act

214.    The Administrative Procedure Act, 5 U.S.C. §§ 701-706, provides for judicial review of federal agency determinations such as those at issue here.  The APA requires a reviewing court to hold unlawful and set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

### F. Declaratory Judgment Act

215.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, authorizes "any court of the United States" to "declare the rights and other legal relations of any interested party seeking such declaration."

## CLAIMS FOR RELIEF

## COUNT I

VIOLATIONS OF NEPA AND ITS IMPLEMENTING REGULATIONS AND THE APA: UNLAWFUL PREDETERMINATION OF THE SUPPLEMENTAL ENVIRONMENTAL AND SECTION 4(F) ANALYSIS (AGAINST ALL DEFENDANTS)

216.    Plaintiff hereby incorporates by reference and realleges each and every allegation of the Paragraphs above.

217.    Defendants violated NEPA and its implementing regulations, 40 C.F.R. Part 1500-1508 and 23 C.F.R. Part 771, and the APA because they pre-judged the outcome of their supplemental environmental review and Section 4(f) analysis by making the following significant irreversible and irretrievable commitments of

COMPLAINT

resources to the Project while the supplemental environmental review process was ongoing, which limited the choice of reasonable alternatives:

    a)    Executing the FFGA, which commits $1.187 billion to Section 2 of the Project;

    b)    Executing the Section 2 Design/Build contract, which commits $1.3765 billion to design and build the Project, and issuing a Notice to Proceed with construction;

    c)    Disbursing $200 million under the FFGA, including for acquisition of property along the right of way and final design services, in violation of applicable regulations;

    d)    Using federal and other funds to acquire properties for the Project Staging Areas, although the Defendants were required to consider alternatives;

    e)    Using federal and other funds to acquire properties along the Project Alignment, although the Defendants were required to consider alternatives;

    f)    Using federal and other funds for relocations of tenants at properties at the Project Staging Areas and along the Project Alignment, although Defendants were required to consider alternatives; and

    g)    Using federal and other funds for final design work, although no supplemental ROD had been completed.

218.    Defendants' significant commitment of resources limited the range of alternatives and rendered the supplemental environmental analysis a justification after the fact.

219.    Such actions were arbitrary, capricious, and an abuse of discretion in violation of NEPA, its implementing regulations, and the APA.

COMPLAINT

**COUNT II**

VIOLATIONS OF NEPA AND ITS IMPLEMENTING REGULATIONS AND THE APA: FAILURE TO ADEQUATELY ASSESS AND DISCLOSE ENVIRONMENTAL IMPACTS OF THE PROJECT AND ITS ALTERNATIVES (AGAINST ALL DEFENDANTS)

220.   Plaintiff hereby incorporates by reference and realleges each and every allegation of the Paragraphs above.

221.   Defendants violated NEPA and its implementing regulations, 40 C.F.R. Part 1500-1508 and 23 C.F.R. Part 771, and the APA because they:

a)   Failed to take the requisite "hard look" at the environmental impacts of the proposed Project and available alternatives, including significant information bearing directly on the environmental and safety impacts of the Project;

b)   Failed to adequately address the Santa Monica Boulevard Alternative, the Proposed Alternative Alignments, and the Proposed Alternative Staging Area, as the FEIS and FSEIS do not include pertinent information relevant to these alternatives and the comparison of the alternatives to the Project Alignment and Staging Areas favored by the Agencies;

c)   Failed to adequately account for the impact the Project will have on the High School, including the preclusive effect it will have on the School District's ability to implement its Master Plan for development; and

d)   Failed to adequately address the impact of harmful emissions and particulates, noise and vibration from construction activity at the Project Staging Area directly adjacent to the High School's portable classrooms on the health of students, faculty, and community members, and the impact on children's education.

222.   Defendants acted arbitrarily and capriciously in approving the Project based on a factual record that contains both questionable data and gaping omissions.

223.   Such actions were arbitrary, capricious, and an abuse of discretion in violation of NEPA, its implementing regulations, and the APA.

COMPLAINT

## COUNT III

### VIOLATIONS OF SECTION 4(f) AND ITS IMPLEMENTING REGULATIONS AND THE APA

### (AGAINST ALL DEFENDANTS)

224.  Plaintiff hereby incorporates by reference and realleges each and every allegation of the Paragraphs above.

225.  Defendants violated Section 4(f) and the APA through their arbitrary, capricious, and unlawful determinations that:

a)  Section 4(f) does not apply to part of Building C, despite the fact that Building C—the High School's future gymnasium—is a recreational resource protected under Section 4(f) and the underground parking structure will permit community access to the gymnasium and other recreational resources;

b)  Construction and operation of the Project Alignment will result in a *de minimis* impact on historic Building B1 on the High School campus, despite that ground settlement beneath the historic building is likely to result in exterior cracking and thus cause significant adverse impact; and

c)  The Project Staging Areas do not result in a "constructive use" of the High School's recreational resources, despite the fact that harmful emissions and particulates, noise and vibration from construction activity will adversely affect the High School's athletic fields.

226.  Additionally, Defendants violated Section 4(f) and the APA through their arbitrary, capricious, and unlawful determination that there are no feasible and prudent alternatives to the Project Alignment because they:

a)  Failed to properly weigh the factors under 23 C.F.R. § 774.3, including the relative significance of each Section 4(f) property, the severity of harm to each Section 4(f) property, and the views of the officials with jurisdiction over each Section 4(f) property; and

b) Failed to use a point system to weigh alternatives, which rendered their analysis opaque and meaningless.

227.   Additionally, Defendants violated Section 4(f) and the APA through their arbitrary, capricious, and unlawful determination that the Project Alignment causes the "least possible harm" of the alternatives that use Section 4(f) resources, because they:

a) Failed to properly weigh the factors under 23 C.F.R. § 774.3, including the relative significance of each Section 4(f) property, the severity of harm to each Section 4(f) property, and the views of the officials with jurisdiction over each Section 4(f) property;

b) Failed to use a point system to weigh alternatives, which rendered their analysis opaque and meaningless; and

c) Improperly rejected the School District's proposed Camden and Linden Alternatives, which will cause the least overall harm, by failing to properly weigh the relevant factors and manufacturing additional Section 4(f) impacts that do not exist and that contradict longstanding Section 4(f) policy with regard to historic districts.

228.   Defendants also violated Section 4(f) and the APA through their arbitrary, capricious, and unlawful determination that there are no "feasible and prudent" alternatives to the Project Staging Areas, because they failed to engage in any analysis of the factors under 23 C.F.R. § 774.17 before rejecting Project Staging Area 1, instead conclusorily stating that the site is unavailable.

229.   Defendants also violated Section 4(f) and the APA by failing to engage in all possible planning to mitigate harm to Section 4(f) resources.

230.   Such determinations were arbitrary, capricious, and an abuse of discretion in violation of Section 4(f) and the APA.

COMPLAINT

# COUNT IV

## VIOLATIONS OF SECTION 106 AND THE APA

### (AGAINST ALL DEFENDANTS)

231.   Plaintiff hereby incorporates by reference and realleges each and every allegation of the Paragraphs above.

232.   Defendants violated Section 106 and the APA when they determined that the Campus would not be affected by the construction of a subway tunnel beneath the Campus, because:

a)  The construction activities will cause noise, airborne emissions, and vibrations that will affect the historic buildings,  diminish the integrity of the Campus, and negatively impact the health of those using its facilities, including its historic and recreational areas; and;

b)  The operation of a subway tunnel beneath the Campus would cause noise and vibrations that would introduce atmospheric and audible elements that diminish the integrity of the property's significant historic features.

233.   Such determination was arbitrary, capricious, and an abuse of discretion in violation of Section 106 and the APA.


# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court grant the following relief:

A.      Declare that Defendants violated NEPA, Section 4(f), Section 106, and the APA by issuing the ROD approving the FEIS and the FSEIS;

B.      Issue an injunction requiring that Defendants fully comply with the provisions of NEPA (including but not limited to preparation of a further supplemental environmental analysis), Section 4(f), Section 106, and their implementing regulations, and specifically to ensure that Defendants take no

COMPLAINT

1  further actions toward proceeding with the Westside Subway Extension Project

2  until they have fully complied with those laws;

3      C.    Issue an injunction prohibiting the FTA from obligating or disbursing

4  federal funds, including but not limited to New Starts, TIFIA, CMAQ funds, to the

5  Project until the defendants have fully complied with the provisions of NEPA;

6      D.    Issue an injunction prohibiting Metro from receiving or using federal

7  funds, including but not limited to New Starts, TIFIA, and CMAQ funds, for the

8  Project and using any previously disbursed federal funds, including for acquisition

9  of any portion of Plaintiff's property or construction of the Project thereon, until

10 the defendants have fully complied with the provisions of NEPA;

11     E.    Declare that the FEIS and FSEIS are invalid;

12     F.    Order that the Supplemental Record of Decision dated November 22,

13 2017 be vacated, set aside, and/or rescinded.

14

15 Dated:  January 26, 2018                    KASOWITZ BENSON TORRES
16                                             LLP

17                                             By: /s/ Kirsten C. Jackson
                                               Kirsten C. Jackson
18                                             Jennifer S. Recine
                                               Gary W. Dunn
19                                             Matthew J. Weiser
                                               Tiffany L. Ho
20
                                               Attorneys for Plaintiff  Beverly Hills
21                                             Unified School District

22

23

24

25

26

27

28

COMPLAINT